USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1286 BARBARA THOMAS, AS COMMITTEE FOR FRANCES L. WERNER, Plaintiff - Appellee, v. METROPOLITAN LIFE INSURANCE COMPANY, Defendant - Appellant. ____________________ No. 94-1287 BARBARA THOMAS, AS COMMITTEE FOR FRANCES L. WERNER, Plaintiff - Appellant, v. METROPOLITAN LIFE INSURANCE COMPANY, Defendant - Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ [Hon. David S. Nelson, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ _____________________ Joseph Trovato, with whom David J. Larkin, Jr. and Sandra ______________ _____________________ ______ Parker were on brief for defendant-appellant. ______ Lawrence J. Casey, with whom Scott E. Bettencourt and Crowe, _________________ ____________________ ______ Crowe & Vernaglia, P.C. were on brief for plaintiff-appellee. _______________________ ____________________ November 28, 1994 ____________________ -2- TORRUELLA, Chief Judge. This case involves a dispute TORRUELLA, Chief Judge. ____________ arising under an insurance policy, part of the Empire Plan, issued by defendant-appellant Metropolitan Life Insurance Company ("Met Life") to plaintiff-appellee Frances Werner.1 Because we agree with the district court that the policy terms mandate coverage here, and that Met Life acted in good faith and committed no unfair or deceptive practices, we affirm. I. BACKGROUND I. BACKGROUND McLean Hospital ("McLean") is a psychiatric hospital located in Belmont, Massachusetts. Its forty-six building campus consists numerous patient care buildings, as well as buildings for the hospital's operations, such as offices, laundry, storage, and garages. McLean primarily provides, on an inpatient basis, diagnostic and therapeutic facilities for the diagnosis, treatment and care of mentally ill persons by licensed physicians. McLean also provides continuous, 24-hour-a-day nursing services to its patients under the supervision of a registered graduate nurse. Through its various facilities and programs, McLean offers its patients a spectrum of care and treatment that aims to foster less dependence on institutional support. These programs range from the psychotic disorders program, in which patients are constantly supervised and have little responsibility, to the community residential and treatment programs, which provide  ____________________ 1 Ms. Werner brings suit by and through her Committee, Barbara Thomas. -3- patients with a structured environment, a somewhat independent living arrangement, and the same 24-hour-a-day professional and ancillary hospital services that are available in the more restrictive treatment units. The Hope Cottage and the Mill Street Lodge are two such residential treatment programs available at McLean. All of the programs at McLean, including the residential treatment programs, are staffed by McLean employees, and all services provided through these programs are billed through McLean's central accounting department. In September 1985, Frances Werner, a diagnosed paranoid schizophrenic, was admitted to McLean and initially placed in the psychotic disorders unit. In March 1986, her condition had improved, and she was transferred to the community residential and treatment program at McLean. While in the community residential and treatment program, Werner was assigned a bed in the Hope Cottage building until March 1989, and in the Mill Street Lodge building from March 1989 until February 1992.2 Werner was assessed a room and board charge during her stay at McLean, including the period she spent in the Hope Cottage and Mill Street Lodge buildings. Werner is an enrollee under a group health insurance policy known as the Empire Plan (the "Plan"), which provides health insurance benefits to New York State Government employees  ____________________ 2 Werner was transferred back into the psychotic disorders program for approximately one month during September and October 1989. -4- and their dependents. Under the Plan, Werner is eligible to receive benefits for covered medical services that are provided to her. The Plan provides that Blue Cross pay for covered services for the first 120 days of care, and that Met Life pay for such services after the initial 120 days. Blue Cross paid its liability for the first 120 days that Werner was in McLean. After the initial 120 days, Met Life paid for the services received by Werner while she was in the psychotic disorders program (September 5, 1985 to March 6, 1986, and September 14 to October 10, 1989). Met Life denied Werner's claims for services received while she was in McLean's community residential and treatment program, however, contending that neither the Hope Cottage nor the Mill Street Lodge are within the scope of the Plan. The Plan specifically provides that Met Life will pay for certain covered medical expenses, including "[s]ervices of private proprietary hospitals for the treatment of mental and ______________________________ nervous conditions and alcoholism" (emphasis added). The Plan further defines "hospital" as "only an institution which meets fully every one" of three tests. The Plan sets forth these tests as follows: 1. It is primarily engaged in providing on an inpatient basis diagnostic and therapeutic facilities for surgical or medical diagnosis, treatment and care of injured and sick persons by or under the supervision of a staff of physicians who are duly licensed to practice; and 2. It continuously provides 24-hours-a- day nursing service by or under the -5- supervision of registered graduate nurses; and 3. It is not a skilled nursing facility and it is not, other than incidentally, a place of rest, a place for the aged, a place for drug addicts, a place for alcoholics or a nursing home. The phrase "on an inpatient basis" is defined under the Plan to mean that the institution assesses a room and board charge. Met Life received a letter dated October 18, 1990 from one of Werner's physicians at McLean, Dr. Peter Choras. In his letter, written on McLean Hospital letterhead, Dr. Choras explained the urgency of Werner's medical situation, and entreated Met Life to provide coverage for Werner's treatment at the Mill Street Lodge, which he called a "half-way house." In response, Met Life reiterated that no benefits were available, because residential facilities or programs, including "halfway houses," were not covered by the Plan. Met Life further explained that it "must adhere to the plan provisions as stipulated by the contract holder." After receiving requests on Werner's behalf from another physician and an attorney to reconsider its denial of coverage, Met Life apparently looked for the Mill Street Lodge in the American Hospital Association accreditation manual. Although McLean Hospital was listed, the Mill Street Lodge was not. Met Life responded to these appeals on March 5, 1991, requesting additional information about the Mill Street Lodge to aid its reconsideration. According to Met Life, it never received any information that changed its determination that the Mill Street -6- Lodge was not a covered facility. Werner brought suit against Met Life in August 1991, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, unfair and deceptive practices in violation of Mass. Gen. L. ch. 93A and 176D, and infliction of emotional distress.3 Werner moved for declaratory relief, for summary judgment on her breach of contract claim, and requested a jury trial on her other claims. Met Life cross-moved for summary judgment on all Werner's claims, contending that Mill Street Lodge and the Hope Cottage were not hospitals under the Plan, and that it had not engaged in any unfair or deceptive practices. After a hearing on the motions, the district court granted judgment in Werner's favor on her request for declaratory relief and her claim of breach of contract, and in Met Life's favor on the remaining claims. Both Met Life and Werner appealed. II. ANALYSIS II. ANALYSIS A. Standard of Review A. Standard of Review __________________ Because the district court granted summary judgment in Werner's favor regarding the breach of contract claim, we review that decision de novo. Serrano-P rez v. FMC Corp., 985 F.2d 625, __ ____ _____________ _________ 626 (1st Cir. 1993); Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. ______ _____ 1993). We must determine whether the record, viewed in the light  ____________________ 3 Werner has voluntarily withdrawn her claim for emotional distress on appeal, but preserves her right to seek emotional distress damages under Mass. Gen. L. ch. 93A. -7- most favorable to Met Life and drawing all reasonable inferences in Met Life's favor, presents any genuine issues of material fact, and whether Werner is entitled to judgment as a matter of law. Summary judgment may not be granted if the evidence is such that a reasonable jury could return a verdict for Met Life. Serrano-P rez, 985 F.2d at 626. Mere allegations, or conjecture _____________ unsupported in the record, are insufficient to raise a genuine issue of material fact. Wynne v. Tufts Univ. Sch. of Med., 976 _____ _________________________ F.2d 791, 794 (1st Cir. 1992), cert. denied, 113 S. Ct. 1845 _____ ______ (1993). Regarding Werner's other claims, conversely, because the district court granted summary judgment in favor of Met Life, we review this decision de novo, and are required to view the __ ____ record in the light most favorable to Werner, the non-moving party. Serrano-P rez, 985 F.2d at 626. _____________ B. Werner's Claims for Breach of Contract B. Werner's Claims for Breach of Contract ______________________________________ Werner claims that the Mill Street Lodge and Hope Cottage fully meet each of the Plan's tests, and therefore all services rendered are fully covered expenses. Met Life, on the other hand, claims that the facilities fail to meet the first two of the three tests set forth in the Plan's definition of "hospital," arguing that they are not "inpatient" facilities and do not provide 24-hour nursing service.4  ____________________ 4 Werner claims, and Met Life does not disagree, that the facilities fully meet the third test of the Plan, i.e., they are not skilled nursing facilities, a place of rest, a place for the aged, a place for drug addicts or alcoholics, or a nursing home. As the record fully supports this claim, we need not address it -8- We first address a preliminary matter. While the rights and obligations of parties under insurance contracts are determined by the language contained in the policy, New York law5 requires that the court determine, in the first instance, whether language in a contract is ambiguous and susceptible to two or more reasonable interpretations. Newin Corp. v. Hartford ___________ ________ Accident and Indem. Co., 467 N.E.2d 887, 889 (N.Y. 1984); __________________________ Hartford Accident and Indem. Co. v. Wesolowski, 305 N.E.2d 907 __________________________________ __________ (N.Y. 1973). We agree with the parties that there are no ambiguities in the relevant language of the Plan. The issue at the heart of this case is whether the residential treatment facilities at McLean meet the Plan's three-part definition of "hospital." Although the dispute arises under the Plan, there is no dispute over the meaning of the terms contained within. Specifically, the parties do not disagree as to the Plan's definition of the term "hospital," nor do they offer differing constructions of that three-part definition. Rather, they disagree over whether the facts presented by Werner's case -- the treatment she received in the residential facilities -- fit that unambiguous definition. In other words, this is not a dispute over the construction of ambiguous terms; rather, it is a dispute over the application of clear terms to somewhat unusual circumstances. Therefore, because "the words in the paragraphs  ____________________ here, and assume it true for purposes of this opinion. 5 The parties do not dispute that we are bound to apply New York law to the construction and interpretation of the Plan. -9- of the policy under examination have a definite and precise meaning, unattended by danger of misconception in the purport of the policy itself, and concerning which there is no reasonable basis for a difference of opinion," Breed v. Insurance Co. of _____ _________________ North America, 413 N.E.2d 1280, 1282 (N.Y. 1978), we find as a _____________ matter of law that there is no ambiguity in the relevant Plan terms here. In the absence of ambiguity, well-settled New York law requires courts to enforce provisions of an insurance policy according to their plain and ordinary meaning. Lavanant v. ________ General Accident Ins. Co. of America, 595 N.E.2d 819, 822 (N.Y. _____________________________________ 1992) (citations omitted); American Home Prods. Corp. v. Liberty ___________________________ _______ Mut. Ins. Co., 565 F. Supp. 1485, 1491-92 (S.D.N.Y. 1983) _______________ (discussing New York contracts law). Courts may not vary the terms of a policy to accomplish "notions of abstract justice or moral obligation." Breed, 385 N.E.2d at 1283. Applying these _____ principles, our task is to determine whether the Mill Street Lodge and Hope Cottage fully meet each of the unambiguous tests set forth in the Plan's definition of "hospital." Met Life argues first that the Mill Street Lodge and Hope Cottage fail the first test. It contends that these facilities do not operate "on an inpatient basis" and do not provide "surgical or medical diagnosis, treatment and care . . . by or under the supervision of a staff or physicians who are duly licensed to practice." Instead, Met Life contends that the two facilities are merely "community or group residences." -10- Under the plain terms of the Plan, however, these facilities do operate on an "inpatient" basis. The Plan defines "inpatient" to mean simply that a room and board charge is assessed to the patient. The record establishes that Werner was assessed such charges for each night of her stay at both the Mill Street Lodge and Hope Cottage. Thus, this requirement is clearly met, and Met Life's contentions to the contrary have no merit. Met Life further insists that the residential facilities are not primarily engaged in "surgical or medical diagnosis, treatment, or care" as the Plan requires. Met Life's counsel conceded in oral argument before this court that the facilities are staffed and operated by McLean personnel, are on the same campus as McLean, and all operational and treatment decisions are made by McLean doctors and staff. Met Life nevertheless contends that the facilities are completely separate and independent entities from McLean, and have different, non- covered functions. In support of this argument, Met Life points to the fact that they are licensed separately by the state of Massachusetts as either a "community residence" or "group residence." We do not see the relevance of the state's licensing scheme to the Plan's definition of covered facilities. Presumably, a state has its own purposes and criteria for licensing and regulating mental health facilities, far different than the intentions of parties to an insurance contract. This case involves the application of contractual terms. The label -11- that state officials may place on a particular facility or treatment program is not part of the Plan's definition of "hospital," and we see no reason to add any other elements, including licensing nomenclature, to the Plan's unambiguous three-part definition of covered facilities.6 Furthermore, we do not agree that the facts in the record show that the facilities are separate and distinct from McLean Hospital. McLean provides comprehensive, individualized treatment plans for mentally ill people, with the aim of developing independent living skills. In order to meet its patients' diverse medical needs, McLean necessarily offers a continuum of programs with varying degrees of supervision and responsibility. When a McLean patient commences a treatment scheme at the hospital, the programs and services provided will naturally depend on the patient's condition, and as part of her ongoing treatment, a McLean patient may be transferred from one program to another. Not all of these programs are in the same building, although they are on the same campus. They are all, however, operated and staffed by the same McLean personnel.  ____________________ 6 Even if we were to consider the residential facilities' licenses, they nevertheless do not necessarily prove that the facilities are "separate and distinct" from McLean. In a sworn affidavit explaining the licenses, the Director of the Massachusetts Department of Mental Health, Michael H. Weeks, stated that McLean Hospital Corporation is "licensed to conduct residential programs at McLean Hospital . . . in its Hope Cottage and Mill Street Lodge buildings." This characterization by the head licensing official of the state actually contradicts Met Life's arguments, and supports the finding that the residential facilities are not distinct entities, but are integral components of McLean, two of the several treatment programs McLean offers. -12- While the Mill Street Lodge and Hope Cottage exist in separate buildings from the main hospital building, their function and services are not separate from the hospital. On the contrary, they constitute just two of these various treatment programs developed and administered by McLean physicians and staff. Thus, they are two of the integral components that comprise the overall institution of McLean Hospital. This is not to say that any or all facilities owned or even operated by a hospital are necessarily covered by the Plan. Modern hospitals are frequently owned by corporations that also own other healthcare entities, such as laboratories, nursing homes, or outpatient facilities. These entities clearly would not meet the Plan's coverage terms. The programs at issue here, however, are part and parcel of McLean's various medical diagnosis and treatment programs, and thus are covered by the Plan. Met Life also contends that because nurses are not physically present 24 hours a day at the Mill Street Lodge or Hope Cottage, these facilities fail the second prong of the Plan's definition of "hospital." We agree with the district court, however, that the Plan's terms do not require that nurses be physically present 24 hours a day, but merely that nursing services be available 24 hours a day. The record establishes that all of the hospital's nursing and ancillary services are provided in the residential programs. Although those nurses are not physically present in those buildings and must be summoned if -13- needed, the patients in the residential programs nonetheless have the benefit of the nursing services that are available 24 hours a day in the main building. Thus, the Mill Street Lodge and Hope Cottage fully meet this element of the Plan, and the district court's ruling on Werner's breach of contract claims must be affirmed. C. Werner's other claims C. Werner's other claims _____________________ Werner contends that the district court erred in granting summary judgment in Met Life's favor as to her claims for breach of the implied covenant of good faith and for violations of the Massachusetts unfair and deceptive practices statutes, Mass. Gen. L. ch. 93A and 176D. Werner argues that the record contains sufficient evidence giving rise to genuine issues of material fact suitable for a jury trial on these claims. 1. Breach of the covenant of good faith 1. Breach of the covenant of good faith Under New York law, a plaintiff may recover punitive damages for "bad faith" breach of contract where there is evidence of morally reprehensible conduct directed at the general public, Halpin v. Prudential Ins. Co., 401 N.E.2d 171 (N.Y. ______ _____________________ 1979), or an extraordinary showing of a disingenuous or dishonest failure to carry out a contract. Gordon v. Nationwide Mut. Ins. ______ ____________________ Co., 285 N.E.2d 849, 854 (N.Y. 1972), cert. denied, 410 U.S. 942 ___ _____ ______ (1973). Regarding her allegations of Met Life's bad faith, Werner simply has not shown that Met Life's conduct in the instant case rises to the level of morally reprehensible conduct -14- or extraordinary dishonesty. To avoid summary judgment, a nonmoving party must be able to point to some specific, competent evidence in support of its claim. Wynne, 976 F.2d at 794. Mere _____ allegations or conjecture are insufficient to raise a genuine issue of material fact. Id. Although Werner heatedly accuses __ Met Life of callous indifference to Werner's predicament, the record contains no evidence of any bad faith by Met Life. True, Met Life denied Werner's claims. Contrary to Werner's contention, however, Met Life did state the basis for its denial -- it concluded that the charges were not covered by the Plan. Although this conclusion was erroneous, it was not unreasonable, particularly in light of Dr. Choras' own characterization of the Mill Street Lodge as a "half-way house." Certainly, an insurance company may deny claims if it honestly and reasonably believes that it is not obligated to pay them.7 Werner also claims that Met Life conducted no investigation of the relationship between McLean and the Mill Street Lodge. If true, this failure to investigate may constitute ordinary negligence, but it does not rise to the level of extraordinary dishonesty or morally reprehensible conduct directed at the general public. A claims adjuster in a large insurance company is usually not a doctor or an attorney, and cannot be expected to compile and analyze extensive information for every claim. We refuse to issue a  ____________________ 7 We also note that Werner's dire medical and financial situation does not transform Met Life's denial of coverage into a bad faith act. Met Life honestly and reasonably believed that it was not legally bound to pay Werner's claims. -15- directive to insurance companies requiring such lengthy procedures. Moreover, the record does contain evidence that after receiving letters on Werner's behalf, Met Life did investigate Werner's claims, and requested additional information to that effect, which it never received. We therefore find that as a matter of law, Werner has not shown any specific evidence supporting its claims of bad faith sufficient to avoid summary judgment, and the district court's judgment in Met Life's favor on this claim must be affirmed. -16- 2. Violation of the Massachusetts unfair practices 2. Violation of the Massachusetts unfair practices statute statute Werner also claims that Met Life has violated Mass. Gen. L. ch. 93A and 176D, which prohibit unfair or deceptive acts or practices in the business of insurance. It is questionable whether, under choice-of-law analysis, these statutes can fairly be applied to Met Life in this context, in light of the fact that the claims arise under a contract governed by the laws of New York. We need not address this issue, however, because assuming arguendo that chapters 93A and 176D can properly be applied, ________ Werner has failed to point to sufficient evidence supporting her claims to avoid summary judgment. Wynne, 976 F.2d at 794. _____ Chapters 93A and 176D together prohibit unfair or deceptive practices in the business of insurance, and allow one injured by such unlawful acts to bring an action for damages and equitable relief. Section 3 of chapter 176D sets forth several unfair claim settlement practices, including "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." Mass. Gen. L. ch. 176D 3(9)(d).8 The Massachusettts Supreme Judicial Court has held that a plaintiff may recover under chapters 93A and 176D for a deceptive act that is the result of the insurance company's  ____________________ 8 Section 3 of chapter 176D lists eleven unfair claim settlement practices. In her brief, Werner states that Met Life committed "several" of these, but she does not specify which ones, much less how they were committed. The only violation that Werner specifically alleges is a failure to conduct a reasonable investigation. Because we find no hint in the record of any other possible violations, we only analyze Werner's specific allegation. -17- negligence. Swanson v. Bankers Life Co., 450 N.E.2d 577, 580 _______ _________________ (Mass. 1983). The plaintiff need not show any actual intent to deceive, and an act may be deceptive even absent any showing of negligence. Id. at 580. The court warned, however, that "not __ every negligent act is unfair or deceptive" and thus unlawful under chapter 93A. Id. To determine whether an insurer's __ negligence constitutes "unfairness" for 93A purposes, a court must look to several factors, including what the insurer "knew or should have known" about the circumstances of a particular claim. Id. (citations omitted). __ Werner argues that, on the facts presented, a trier of fact could reasonably find that Met Life's failure to call McLean, look into the hospital's accreditation, or examine the letterhead on which correspondence was sent, was "sufficiently egregious" to incur liability under 93A. These facts constitute, according to Werner, a blanket denial of coverage without any reasonable investigation. As we noted above, the record does contain evidence that after receiving several letters on Werner's behalf, Met Life investigated Werner's claims, and requested additional information. We therefore cannot agree with Werner that Met Life failed altogether to investigate her claim. Perhaps the Met Life employees could have been more thorough; perhaps they should have taken more initiative after receiving Dr. Choras' letter on McLean letterhead and inquired after the specifics of McLean's residential programs. As we have noted, however, hospital -18- corporations often own and operate healthcare entities that would not come within the Plan's coverage. This reality, combined with the fact that the Mill Street Lodge was not listed in a hospital accreditation manual, and that Dr. Choras himself labelled the facility as a "half-way house," compels us to find that their failure to inquire further, and their decision to deny Werner's claims, was not unreasonable, and certainly does not constitute "unfairness" in violation of 93A and 176D. III. CONCLUSION III. CONCLUSION For the foregoing reasons, the district court's judgment as to each of Werner's claims is hereby affirmed. ________ -19-