# United States Court of Appeals

## For the First Circuit

---

No. 03-2601

KATHY POULIS-MINOTT, as personal representative
of the Estate of Carlyle Minott,

Plaintiff, Appellant,

v.

DAVID W. SMITH,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Torruella, Dyk[*], and Howard,
Circuit Judges.

---

David J. Berg, with whom Carolyn M. Latti and Latti & Anderson LLP, were on brief, for appellant.
Mark E. Dunlap, with whom Norman Hanson & DeTroy, LLC, was on brief, for appellee.

---

October 28, 2004

---

[*] Of the Federal Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  On October 23, 2000, Captain Carlyle Poulis-Minott took the forty-four foot fishing vessel, the F/V KATINA ASHLEY (the "Vessel"), out on a solo fishing trip and never returned.  On October 24, 2000, the Coast Guard received a distress call from the Vessel's Emergency Position Indicating Radio Beacon ("EPIRB").[1]  The Vessel and its life raft were never found, and no one knows exactly what happened to the Vessel or whether Captain Minott had any opportunity to access the Vessel's lifesaving gear before he drowned.

Plaintiff-appellant Kathy Poulis-Minott, as personal representative of the estate of Carlyle Minott (the "Estate"), filed an action against the owner of the Vessel, defendant-appellee David W. Smith, seeking damages based on two theories of liability: Jones Act negligence and unseaworthiness.  The Estate then filed a motion for summary judgment, claiming that the existence of several Coast Guard safety regulation violations aboard the Vessel entitled it to summary judgment on the Jones Act and unseaworthiness claims, and eviscerated Smith's contributory negligence and primary duty rule affirmative defenses.  Smith, in turn, contested the Estate's arguments and sought summary judgment, arguing that (1) the Estate failed to show the causation necessary for its Jones Act and

---

[1]  EPIRBs are designed to alert rescue authorities and indicate a vessel's location when a vessel is in distress.

unseaworthiness claims; (2) Minott was the owner <u>pro</u> <u>hac</u> <u>vice</u> of the Vessel; and (3) that Minott was contributorily negligent.

The district court granted Smith's motion for summary judgment as to all claims, finding that the Estate failed to establish any triable issues of fact regarding causation with respect to its Jones Act and unseaworthiness theories of liability.

The Estate now appeals the decision of the district court. First, the Estate challenges the district court's failure to exclude certain testimony of Smith's experts and to strike portions of their late-filed affidavits. The Estate also challenges the inclusion in the Magistrate Judge's factual narrative of defendant experts' opinions that "the likely cause of the sinking of the Vessel is that it was struck and dragged by another vessel . . ." and that "the safety equipment on the Vessel was in place and up to date as of late September 2000," both for failing to comply with Federal Rule of Evidence 56 and for other evidentiary reasons. Finally, the Estate claims that the district court erred in dismissing the Estate's Jones Act and unseaworthiness claims based on its failure to invoke the burden-shifting <u>Pennsylvania</u> Rule (<u>The S.S. Pennsylvania</u> v. <u>Troop</u>, 86 U.S. (19 Wall.) 125, 135 (1873)).

After careful review of the record, we affirm the judgment of the district court.

# I.  The Facts

## A.  Evidentiary Issues

It is important to address at the outset the district court's evidentiary rulings in response to the Estate's Motions to Strike and to Exclude because these decisions partially define the world of facts that are available for consideration of the summary judgment motions.  We will reverse the district court's evidentiary rulings only where there is an abuse of discretion.  Díaz-Rivera v. Rivera-Rodríguez, 377 F.3d 119, 123 (1st Cir. 2004) (citing Cummings v. Standard Register Co., 265 F.3d 56, 62 (1st Cir. 2001)).

The appellant raises three related challenges to the district court's discovery management.  First, the appellant argues that the district court erred in failing to strike as outside the scope of Smith's expert designation, portions of three late-filed expert affidavits submitted by Smith on July 1, 2003, four days after the discovery deadline of June 26, 2003, and one and a half months after the defendant's expert disclosure deadline of May 15, 2003.  The disputed affidavits came from three of the experts named in Smith's May 15, 2003 expert designation: Lea Leavitt, Craig Mifflin and David DuBois.  Second, the Estate contends that the district court abused its discretion by failing to exclude several of the expert opinions that the Estate claims (1) lacked the reliability required by Daubert v. Merrel Dow Pharmaceuticals,

Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and (2) contained conclusory assertions that did not explain the experts' reasoning. Finally, the Estate claims it was an error of law for the district court not to address the qualifications of the defendant's experts. See Fed. R. Evid. 702.

## 1.  Disclosure and Timeliness of Expert Opinions

In considering the Estate's motions to strike and exclude, the Magistrate Judge meticulously reviewed each paragraph the plaintiff identified as containing newly disclosed expert opinions and granted the plaintiff's motion for certain paragraphs and denied the motion for others. See Plaintiff's Motion to Exclude Various Opinions of Defendant's Experts, Minott v. Smith, No. 03-10-P-H, 2003 WL 22078070 (D. Me. Sep. 05, 2003) (No. 13) ("Motion to Exclude"); Plaintiff's Motion to Strike Portions of Defendant's Affidavits in Support of His Cross Motion for Summary Judgment, Minott, 2003 WL 22078070 (No. 19) ("Motion to Strike"). The appellant now claims that the Magistrate Judge erred by failing to strike or exclude the remaining objected-to paragraphs.

Federal Rule of Civil Procedure 26(a) provides that "a party shall disclose to other parties the identity of any person who may be used at trial to present [expert opinion evidence]" and submit a detailed report including the expert's qualifications and "a complete statement of all opinions to be expressed and the basis and reasons therefor."  Fed. R. Civ. P. 26(a)(2)(A)-(B).  This

Court has held these directives to be mandatory since the adoption of Rule 37(c)(1), which "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule." Klonoski, M.D. v. Mahlab, M.D., 156 F.3d 255, 269 (1st Cir. 1998). "[T]he required sanction in the ordinary case is mandatory preclusion." Id.

Rule 37(c)(1) enforces Rule 26(a) by providing that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence . . . any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1). Although Rule 37(c)(1) is traditionally invoked to preclude expert testimony at trial, it can also be applied to motions for summary judgment. See Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 60 (1st Cir. 2001) (citing Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1007-09 (8th Cir. 1998) (finding that a products liability defendant, whose summary judgment motion relied partially on the plaintiff's lack of expert testimony, would have been significantly prejudiced by plaintiff's untimely expert disclosure)). However, as we have previously noted, Rule 37(c)(1) "allows the court to admit belatedly proffered expert evidence if the proponent's failure to reveal it was either substantially justified or harmless." Lohnes, 272 F.3d at 60.

The purpose of the expert disclosure rules is "to facilitate a 'fair contest with the basic issues and facts disclosed to the fullest practical extent.'" Id. (quoting Thibeault v. Square D. Co., 960 F.2d 239, 244 (1st Cir. 1992)). Thus Rules 26(a) and 37(c)(1) seek to prevent the unfair tactical advantage that can be gained by failing to unveil an expert in a timely fashion, and thereby potentially deprive a plaintiff of the opportunity to "depose the proposed expert, challenge his credentials, solicit expert opinions of his own, or conduct expert-related discovery." Id.

Here, the Magistrate Judge focused on determining whether the expert opinions in the affidavits had been disclosed during the discovery period in accordance with Rule 26(a). Unlike the situation in Lohnes or Trost, Smith actually disclosed the identity of his experts and provided the Estate and court with expert designations that included the opinions the experts would express in accordance with the court's deadline for expert designations. The issue here is not that the experts' affidavits were entirely new and unannounced, but rather whether any new information was included in the expert affidavits that was not included in the "complete statement of all opinions to be expressed," as required by Rule 26(a).

In ruling on the affidavits, the Magistrate Judge clearly evaluated each segment of the affidavits individually. In some

paragraphs, the court found that the May 15, 2003 designation of experts adequately encompassed the opinions in the affidavits. In paragraphs where the district court found the expert opinion to be beyond the scope of expert designation, the Estate's motion to strike was granted. In so doing, the Magistrate Judge ensured that consideration of any remaining information in the affidavits would be harmless to the plaintiff. For example, the Magistrate Judge granted in part Plaintiff's Motion to Strike with regard to Paragraph 23 of Leavitt's affidavit where Leavitt "opines that the Vessel was rammed" because the Judge found it was not fairly disclosed in Smith's expert designation. <u>Minott</u> v. <u>Smith</u>, No. 03-10-P-H, 2003 WL 22078070, at *5 (D. Me. Sep. 05, 2003). However, the Judge denied the motion as to the second sentence in Paragraph 23 because he determined that the contents of the sentence "should come as no surprise in view of Smith's disclosure in his expert designation." <u>Id.</u> For these reasons, we find that the district court did not abuse its discretion in denying the plaintiff's motion to strike with respect to the remaining paragraphs.

**2. Allegedly Conclusory and Unreliable Expert Opinions**

We find that the Magistrate Judge was also within his discretion in allowing the allegedly conclusory and unreliable opinions of Smith's experts. Here again, the Magistrate Judge scrupulously considered each paragraph in question and determined that some opinions were inadmissible legal conclusions, while

-8-

others could not be "characterized as 'conclusory' in the sense contemplated by Hayes v. Douglas Dynamics, Inc." Minott, 2003 WL 22078070, at *4 (citing Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993) ("Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues.")). For example, the Magistrate Judge granted the Estate's Motion to Strike as to Paragraph 6 of DuBois' Affidavit because he found it to be an inadmissible legal conclusion. Id. at *6.

The Magistrate Judge also considered whether the opinions were reliable under the Daubert standard and thoroughly explained his determinations. Id. (citing Daubert, 509 U.S. at 589). For example, the Magistrate Judge denied the Motion to Exclude for Paragraph 14 of Leavitt's affidavit, finding that Leavitt's opinion that Minott would be able to take steps to save himself if he had time to respond, was sufficiently reliable for Daubert purposes, because although it was not highly technical, it was "based on a mixture of specialized knowledge of [the fishing] industry and highly personal knowledge of the habits and character of [Minott]." Id. at *4.

### 3. Qualifications of Defendant's Experts

Finally, we find no reversible error of law due to the lack of an explicit ruling on the qualifications of Smith's

-9-

experts.  Federal Rule of Evidence 702 provides that an expert must be qualified to testify based on the expert's knowledge, skill, experience, training or education.  It is the responsibility of the trial judge to act as gatekeeper and ensure that the expert is qualified before admitting expert testimony.  Correa v. Cruisers, a Div. of KCS Intern., Inc., 298 F.3d 13, 24 (1st Cir. 2002); see also Daubert, 509 U.S. at 589, 592 (discussing a judge's role in screening scientific expert testimony); Kumho Tire Co., 526 U.S. at 141 (extending Daubert's gatekeeping obligation to other non-scientific testimony); Diefenbach v. Sheridan Transp., 229 F.3d 27, 30-31 (1st Cir. 2000)(setting forth the requirements of Rule 702). In the summary judgment context, Rule 56(e) states that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); see also Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991).  The "trial court has 'broad discretionary powers' in qualification of experts[,] and that court's decision will be affirmed unless there is clear error." Correa, 298 F.3d at 26 (quoting Diefenbach, 229 F.3d at 30).

In its Motion to Exclude, the Estate argued that the defendant failed to specify the qualifications for four of his experts: Lea Leavitt, Craig Mifflin, Dennis Custeau, and Chris Harrison.  The Estate explicitly stated that it raised the issue of

-10-

qualifications "in order to preserve its objection to the qualification of these expert witnesses at the time of trial." Plaintiff's Motion to Exclude at 6. It is unnecessary to address Custeau and Harrison's qualifications here because their opinions are not relied on in establishing the facts cognizable on summary judgment. However, the district court did, as do we, consider some of the opinions provided by Leavitt and Mifflin.

In his Recommended Decision and Memorandum Decision on Ancillary Motions, the Magistrate Judge deferred making a decision on the Estate's charge that there was a lack of specification of the experts' qualifications based on the fact that the Estate specifically noted that it was raising the issue to preserve the point for trial. Minott, 2003 WL 22078070, at *3. While he did not explicitly rule on the qualifications portion of the Motion to Exclude, the Magistrate Judge did indicate his awareness of Leavitt and Mifflin's qualifications when he granted or denied specific objections the plaintiff raised to their affidavits by making several references to their qualifications. For example, the Magistrate noted that Leavitt "was an experienced fishing-boat captain." Id. at *4. The judge also noted that Leavitt's statement was based on "a mixture of specialized knowledge of an industry (fishing)." Id. With respect to Mifflin, the Magistrate Judge was clearly aware of the qualifications contained in Mifflin's affidavit regarding his experience as a fisherman and as

-11-

captain of the Vessel since he discussed Mifflin's responsibilities, including safety responsibilities, as captain of the F/V KATINA ASHLEY. See id. at *6.

As a district court has broad discretion in its determination of the qualification of experts, and as the Magistrate Judge here chose not to strike or exclude specified portions of the expert affidavits, and noted some of the experts' qualifications while ruling on other issues, we do not find the lack of an explicit ruling on the qualifications portion of the Motion to Exclude to be an abuse of discretion. However, while we recognize that the Rule 702 inquiry is flexible and that "there is no particular procedure that the trial court is required to follow in executing its gatekeeping function," the use of greater clarity in addressing the qualifications of the experts in this case would have been preferable.

For the above reasons,[2] we find that the district court did not abuse its discretion in accepting those parts of the affidavits which remain for consideration of summary judgment.

_____

[2]  The Estate also challenges the Magistrate Judge's use of the term "foreshadowed" where the Magistrate found certain expert opinions to be "adequately foreshadowed" in Smith's expert designation. Minott, 2003 WL 22078070, at 4-6. We do not deem it necessary to decide whether the term "foreshadowed," as used by the Magistrate Judge, is sufficient to satisfy the requirements of Rule 26(a). Rather, we find that the expert opinions remaining after the Magistrate Judge's surgery are covered by the original disclosure and therefore within the Magistrate Judge's discretion to accept them.

**B.  Facts Cognizable on Summary Judgment**

After resolving the foregoing evidentiary issues raised on appeal, the material facts available for consideration of the motions for summary judgment are largely the same as those described by the Magistrate Judge in the Recommended Decision and Memorandum Decision.

In ruling on a motion for summary judgment, the court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995). These "standards are the same where, as here, both parties have moved for summary judgment." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335-36 (3d ed. 1998)("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.")).  Therefore, as we are reviewing the grant of Smith's motion for summary judgment, we now recite the facts in the light most favorable to the Estate.

David Smith became the owner of the forty-four foot Vessel named the F/V KATINA ASHLEY in 1989.  During the approximately nine years the Vessel was used for fishing, Smith was never the captain.

Smith had several captains of the Vessel, including Craig Mifflin and Carlyle Minott. Mifflin was captain of the Vessel for approximately two years, immediately prior to Minott. He left the position in late September 2000. Minott was the captain of the Vessel as of October 4, 2000. There was no written agreement between Smith and Minott regarding the operation of the Vessel or the length of time Minott would serve as captain.

Smith's captains had a great deal of autonomy and responsibility. Smith did not direct his captains regarding what types of fish they were to catch or where they were to fish, with the exception of limiting their activities to within fifty miles of shore, based on the limit of Smith's insurance policy. In addition, it was Minott's responsibility as captain to review all of the boat's safety systems prior to use because he was responsible for the crew's safety. The Vessel had made twenty-eight fishing trips in 2000 prior to Minott's first fishing trip on October 19, 2000.

While the Magistrate Judge included various opinions by Smith's experts regarding the Vessel's condition and the safety equipment on board the Vessel, we do not find it necessary to consider some of those opinions here. We do note that a few months prior to leaving the Vessel, Mifflin replaced the battery in the EPIRB, and then during his final trip on the Vessel, Mifflin manually tested the EPIRB system.

On October 9, 2000, Michael Monroe, a marine surveyor, performed a Condition & Value Survey of the Vessel on behalf of a potential buyer. Monroe observed and inspected safety/life-saving equipment, including the following: (1) three Type I Personal Flotation Devices (PFDs) without lights,[3] with retro-reflective tape; (2) three survival suits with chem-lights and retro-reflective tape; (3) one Viking inflatable four-person life raft with hydrostatic release; and (4) one Guest 406 EPIRB with hydrostatic release.

The last time the life raft had been serviced or inspected prior to October 23, 2000 was on August 17, 1999. The parties dispute whether there were lights on the Type I PFDs. We can assume there were not. Smith does not know the last time the life jackets were checked or serviced, nor when the lights on the Vessel's survival suits were last inspected.

The Vessel's EPIRB was purchased on January 25, 1999, and Smith does not know when the EPIRB was installed on the Vessel. The EPIRB was registered on February 16, 1999. A Litton hydrostatic release was installed for the Vessel's previous EPIRB on September 7, 1996. Smith does not know whether this was the same hydrostatic release used for the EPIRB on the Vessel on October 23, 2000. Smith has no records showing that he purchased a new hydrostatic release at the time he purchased a new EPIRB in

---

[3]  I.e., life jackets.

January 1999, and no records showing that he purchased a new hydrostatic release for the EPIRB at any time after September 7, 1996. He also has no records showing that the hydrostatic release for the EPIRB was ever inspected.

On October 23, 2000, Minott took the Vessel out on a solo fishing trip. He left port on the Vessel at approximately 3:00 a.m. that day. On October 24, 2000, at 3:36 a.m. the Coast Guard received an EPIRB distress signal from the Vessel. A second signal was received thirty-nine minutes later, and the distance between the two EPIRB hits was approximately eleven nautical miles. Thus, the speed of the EPIRB device between the first and second EPIRB signals was approximately seventeen knots. The Vessel could not have traveled that distance in that amount of time under its own power. The top speed of the Vessel was only ten knots, and the speed at which the Vessel could travel if the fishing nets were out was only 2.3 to 3.5 knots.

The Vessel and its life raft were never found. Captain Minott's body was recovered and the medical examiner's autopsy determined the cause of death to be drowning.

Based on the defendant's Statement of Material Facts and the affidavit of defendant's expert, DuBois, the Magistrate Judge posited that the likely cause of the sinking of the Vessel was that it was struck and dragged by another vessel, and that this must have been a catastrophic event that separated Minott from the

-16-

Vessel before he had a chance to reach any of the safety equipment. While the time and distance between the two EPIRB signals suggests that there was an outside force involved in the incident, we simply do not know what happened or whether Minott had any time to react. Therefore, the inclusion of this hypothesis, which is not favorable to the plaintiff, is not appropriately considered in ruling on a motion for summary judgment for the defendant, and it will not be considered here.

## II.  **Analysis**

A grant of summary judgment is only justified "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  An issue is "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material fact" is one which "might affect the outcome of the suit under the governing law."  Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

We review the district court's grant of summary judgment de novo, and we may affirm the district court's decision on any

-17-

ground supported by the record.  <u>Rodríguez</u> v. <u>Smithkline Beecham</u>, 224 F.3d 1, 5 (1st Cir. 2000).

## A.  <u>The Pennsylvania Rule</u>

Since no one knows precisely what happened to the Vessel on October 24, 2000, or how Captain Minott drowned, the issue of burden of proof is critical in this case.  In the plaintiff's appeal from summary judgment, the plaintiff claims that the district court erred by not applying the <u>Pennsylvania</u> Rule to shift to the defendant the burden of disproving the causation necessary to make out a claim of Jones Act negligence or a claim of unseaworthiness.  We disagree.

The Supreme Court in <u>The S.S. Pennsylvania</u> v. <u>Troop</u>, 86 U.S. (19 Wall.) 125, 135 (1873), established a burden shifting regime for maritime cases where a statutory or regulatory violation has some causal connection to the injury that occurred.  In order to shift the burden of proof to the defendant, the plaintiff must meet a two-part test.  "If a plaintiff can establish both that the defendant breached a statutory duty and that the breach is relevant to the casualty in question, the defendant assumes the burden of proving that its breach could not have caused plaintiff's damages." <u>Pan American Grain Mfg. Co., Inc.</u> v. <u>Puerto Rico Ports Authority</u>, 295 F.3d 108, 115-16 (1st Cir. 2002).

In <u>Pennsylvania</u>, the casualty was a collision that occurred in thick fog between a steamer and a sailing bark.  A

-18-

statute to prevent collisions in heavy fog existed at the time, which mandated that sailing ships, when under way, had to use a foghorn to signal their presence, and when not underway, a bell. The bark was in violation of this statute because it was using a bell to signal its presence instead of a fog horn while it proceeded slowly through the fog. It was unknown whether the fog horn would have been easier for the steamer to hear or whether it would have prevented the collision, but the Supreme Court held that

> "when . . . a ship at the time of a collision
> is in actual violation of a statutory rule
> intended to prevent collisions, it is no more
> than a reasonable presumption that the fault,
> if not the sole cause, was at least a
> contributory cause of the disaster. In such a
> case the burden rests upon the ship of showing
> not merely that her fault might not have been
> one of the causes, or that it probably was
> not, but that it could not have been."

The Pennsylvania, 86 U.S. (19 Wall.) at 136.

This appears to be the portion of the Pennsylvania Rule on which the plaintiff is focused. The Estate alleges that the Vessel was in violation of four Coast Guard regulations at the time of Minott's ill-fated solo fishing trip: (1) the Vessel's life raft was overdue for inspection as of August 17, 2000, in violation of 46 C.F.R. §§ 25.25-11 and 28.140; (2) the life jackets lacked lights, in violation of sections 25.25-11 and 25.25-13, (3) the lights on the survival suits were out of date at least as of October 9, 2000, in violation of sections 25.25-11 and 25.25-13, and (4) the hydrostatic release on its EPIRB had been overdue for

-19-

servicing since September 7, 1997, in violation of sections 25.25-11 and 28.140(b).

Assuming <u>arguendo</u> that the Vessel was indeed in violation of these regulations, there is still another part of the rule which must be met before the court will shift the burden of proving causation. That is, the violation or "fault" must have contributed to the casualty, at least in some degree. <u>Id.</u> Thus, the Supreme Court conceded in <u>The Pennsylvania</u> that "if it clearly appears that the fault could have had nothing to do with the disaster, it may be dismissed from consideration." <u>Id.</u> Since then, the courts, including this court, have held that a plaintiff must establish a relationship between the regulatory violation and the injury in order to invoke the <u>Pennsylvania</u> Rule. <u>In re Complaint of Nautilus Motor Tanker Co.</u>, 85 F.3d 105, 115 (3d Cir. 1996) ("[I]n cases where there is no clear link between the statutory violation and the casualty, the party seeking to take advantage of the [<u>Pennsylvania</u>] Rule has been required to make some showing that the statutory violation may have had some relation to the accident."); <u>Candies Towing Co.</u> v. <u>M/V B & C Eserman</u>, 673 F.2d 91, 94 (5th Cir. 1982)(noting that invocation of the <u>Pennsylvania</u> Rule does not impair the principle that in Jones Act cases, cause in fact is still necessary); <u>Associated Dredging Co.</u> v. <u>Continental Marine Towing Co.</u>, 617 F. Supp. 961, 968 (E.D. La. 1985) (same). Otherwise, "a contrary rule, . . . would result in a presumption of

liability following any statutory violation no matter how remote or inconsequential such a violation may have been to the subsequent accident.  Neither precedent nor logic compels such a drastic result."  In re Complaint of Nautilus Motor Tanker Co., 85 F.3d at 115.

In Pan American Grain, 295 F.3d, at 116, this court noted that in addition to establishing evidence of a statutory violation, it is necessary that the violation be "sufficiently related to the casualty in question" for the Pennsylvania Rule to apply.  In that case we held that the appellant failed to prove that appellees violated any statutory duty.  We went on to state, however, that "even if there were credible evidence of a statutory violation by the appellees, any such violation was not sufficiently related to the casualty in question."  Id.

> The district court [in Pan American Grain] found that the casualty in  question was a direct result of the fact that [the Vessel] struck obstructions outside of its proper area of navigation. Additionally, the obstructions which the [the Vessel] struck were properly marked on the charts and known to the master and pilot.  Thus, appellant has only its own imprudence to blame for the predictable result, and the district court properly refused to apply the Pennsylvania rule.

Id.

The policy underlying the Pennsylvania Rule aims to enforce strict compliance with maritime regulations pertaining to the safe operation of ships.  The Pennsylvania,  86 U.S. (19 Wall.)

at 136; Continental Grain Co. v. Puerto Rico Maritime Shipping Auth., 972 F.2d 426, 436 (1st Cir. 1992) (applying the Pennsylvania Rule to the capsizing and sinking of a vessel because "the policy underlying the rule . . . is to assure strict compliance with rules pertaining to the safe operation of ships"). The courts have noted that the Pennsylvania Rule is "a drastic and unusual presumption." Capt'n Mark v. Sea Fever Corp., 692 F.2d 163, 167 (1st Cir. 1982)(quoting G. Gilmore & C. Black, The Law of Admiralty 494 (2d ed. 1975)); Wills v. Amerada Hess Corp., 379 F.3d 32, 42 (2d Cir. 2004)(quoting Dir. Gen. of India Supply Mission v. S.S. Maru, 459 F.2d 1370, 1375 (2d Cir. 1972)). As a result, courts have been reluctant to "extend the Rule's application in ways that would unmoor it from its animating principles." Id. at 43. Thus, for example, [courts] have held that application of The Pennsylvania Rule is "'limited to the violation of a statute intended to prevent the catastrophe which actually transpired.'" Wills, 379 F.3d at 43 (quoting India Supply Mission, 459 F.2d at 1375). In addition, the Second Circuit has held that "The Pennsylvania Rule does not apply where proof that the legal obligation was breached does not lead 'naturally and logically' to the conclusion that the breach caused the injury." Wills, 379 F.3d at 44 (quoting Wilkins v. Am. Exp. Isbrandtsen Lines, Inc., 446 F.2d 480, 485 (2d Cir. 1971)).

Here we have a casualty for which it is virtually impossible to identify the cause. The fishing boat was lost at sea

and the only evidence of the incident are the EPIRB signals and the recovery of Mr. Minott's remains. Without additional information as to what occurred, it is impossible to determine whether Smith's fault -- the statutory violations -- contributed to the casualty. Any number of hypotheses can be constructed as to what occurred on the F/V KATINA ASHLEY the night it was lost. In some of these scenarios, the statutory violations might be relevant, whereas in others, they would have had nothing to do with the casualty.

To be sure, the Pennsylvania Rule authorizes some degree of speculation as to the causes of the accident, but it does not authorize the degree of speculation urged by the plaintiff here. The rule would not, for example, in the Pennsylvania case itself, have authorized the use of the presumption of fault against the shipping bark based on the fact that a bell was used instead of the required foghorn but for the fact that the second ship was also in motion and that "seasonable warning [could] have enabled her to keep out of the way." 86 U.S. at 136-37. There must be, in other words, proof that under the circumstances there was a reasonable possibility that compliance with the regulatory standard would have prevented the accident. See also Continental Grain, 972 F.2d at 436 (applying Pennsylvania Rule when shifting of free-flowing grain caused the ship in question to sink, and the regulatory violation consisted of failure to adequately secure bulk grain). Here, the plaintiff offers us nothing but speculation at two levels. First,

the plaintiff asks us to assume that the circumstances of the accident were such that Captain Minott could have accessed the lifesaving gear before he drowned. Second, plaintiff asks us to assume that, as a result of the inspection and other violations, the lifesaving gear did not perform as required by the Coast Guard regulations, and that, if it had performed properly, the loss of life would have been avoided. There has been no showing that there was a reasonable possibility that compliance with the regulations would have avoided the loss of life.

The fact is, we do not know what happened, and to rely on pure speculation to conjure a scenario in which the Pennsylvania burden-shifting rule should be applied would be a departure from the limited and cautious manner in which the courts, with good reason, have traditionally invoked this powerful rule. Therefore, we are reluctant to impose a penalty for a statutory violation with no known relation to the loss.

## B. Jones Act and Unseaworthiness Causes of Action

We have determined that it is inappropriate to apply the Pennsylvania Rule to shift the burden of proving necessary causation for a claim of Jones Act negligence or unseaworthiness. Nevertheless, these theories of liability might be met independent of the Pennsylvania Rule. Therefore, we review both the Jones Act and unseaworthiness causes of action to ensure that no genuine

issue of material fact exists that would prevent Smith from being entitled to a judgment as a matter of law.

### 1. Unseaworthiness

Unseaworthiness is a cause of action that enforces the shipowner's absolute duty to provide to every member of his crew "a vessel and appurtenances reasonably fit for their intended use." Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 7 (1st Cir. 2001)(quoting Mitchell v. Trawler Racer Inc., 362 U.S. 539, 550 (1960)); see also Ferrara v. A. V. Fishing Inc., 99 F.3d 449, 453 (1st Cir. 1996) (quoting Mitchell, 362 U.S. at 550)).  While a plaintiff need not prove negligence to recover under the general maritime law theory of unseaworthiness, an unseaworthy condition that is the proximate cause of the injury sustained must be shown. Ferrara, 99 F.3d  at 453 (citing Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 199 (1st Cir. 1980).

Here, the Estate has failed to show a triable issue of proximate cause in support of its unseaworthiness claim.  Assuming that the Estate is correct regarding the existence of safety violations on board the Vessel, such regulatory violations could form an "unseaworthy condition."  However, in order to make out a claim of unseaworthiness, the Estate must also prove that these violations were the "proximate cause" of the injury.  The Estate is unable to prove causation here because no one really knows what happened to the Vessel and Captain Minott, and thus there is no

-25-

evidence linking the violations to the fact that the Vessel sank or that Minott drowned. Since "[m]ere allegations, or conjecture . . . are insufficient to raise a genuine issue of material fact," Thomas v. Metropolitan Life Ins. Co., 40 F.3d 505, 510 (1st Cir. 1994), the district court correctly dismissed appellant's unseaworthiness claim given the dearth of record evidence pointing to any causation whatsoever.

## 2. Jones Act Negligence

The plaintiff also failed to show the causation necessary for a Jones Act negligence claim. The Jones Act provides seamen with an action for damages at law "where an employer's failure to exercise reasonable care causes a subsequent injury even where the employer's negligence did not render the ship unseaworthy." Ferrera, 99 F.3d at 453 (citing Toucet v. Maritime Overseas Corp., 991 F.2d 5, 10 (1st Cir. 1993)). "In contrast to unseaworthiness, a negligence claim under the Jones Act requires a lesser degree of causation: 'A plaintiff's burden of proving causation under the Jones Act is featherweight. . . . Liability, therefore, exists if the employer's negligence contributed even in the slightest to the plaintiff's injury.'" Gifford v. American Canadian Caribbean Line, Inc., 276 F.3d 80, 83 n.2 (1st Cir. 2002) (quoting Ferrera, 99 F.3d at 453).

However, the Estate is incapable of generating a triable issue even as to this lesser, lighter burden of causation. The

-26-

Estate cannot prove that any of the four asserted regulatory violations was in any way causally linked to what happened to the F/V KATINA ASHLEY and Captain Minott, because there is no evidence of what happened other than the two EPIRB distress signals received by the Coast Guard and the fact that Captain Minott drowned. See Magarian v. Hawkins, 321 F.3d 235, 240 (1st Cir. 2003) ("'[C]onclusory allegations, improbable inferences, and unsupported speculation' are insufficient to defeat summary judgment.") (quoting Leblanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993)).

Therefore, we agree with the district court that the appellant has failed to show the necessary causation to make out a claim of Jones Act negligence or unseaworthiness.

## C. Ownership Pro Hac Vice and Contributory Negligence

As we have reached the conclusion that the plaintiff was unable to present a triable issue of fact regarding the causation required under the two theories of liability undergirding the Estate's case, we find it unnecessary to address appellee's affirmative defenses of ownership pro hac vice or contributory negligence.

## III. Conclusion

For the reasons stated above, we affirm the district court's decision.

**Affirmed**.  **Each side to bear its own costs**.

-27-