In the Matter of the Complaint of John L. BROPHY, as Owner of the OIL SCREW CHICA, for Exoneration from or Limitation of Liability, Plaintiff, Appellee,

v.

Paul K. LAVIGNE, Normand Danis, and Deborah Gregoire, Defendants, Appellants.

No. 85–1670.

United States Court of Appeals, First Circuit.

Argued May 7, 1986.
Decided Sept. 22, 1986.

Adrienne Durst, Cambridge, Mass., with whom Nathan Greenberg, Boston, Mass., was on brief, for appellant Paul K. Lavigne.

Roderick H. Potter with whom Potter & Jamieson, Saco, Me., was on brief, for appellants Normand Danis and Deborah Gregoire.

Martin R. Johnson with whom Donna J. Katsiaficas and Lang, Johnson, Bowie & Boutin, Portland, Me., were on brief, for appellee.

Before COFFIN and TORRUELLA, Circuit Judges, and MALETZ,[*] Senior Judge.

TORRUELLA, Circuit Judge.

"We're going over, now!" Thus ended a brief distress call on the night of February 1, 1982 from the master of the fishing vessel CHICA to the Coast Guard, and shortly thereafter, his life and that of his two crewmen.

The CHICA was a thirty-six foot, fiberglass, single oil screw fishing vessel, owned by appellee Brophy, a resident of the Panama Canal Zone, but was leased to appellee DelTorto.

On the morning of the vessel's sinking, February 1, 1982, DelTorto met with Darren Lavigne, the person hired by DelTorto to skipper the CHICA. Together they observed the gale warnings flying from the Coast Guard station in South Portland, Maine. Winds were predicted at between 25 to 40 knots. The forecast indicated, however, that these would be decreasing later in the day. DelTorto left Lavigne with the understanding that the latter would continue to check the weather throughout the afternoon. Depending on the situation Lavigne would decide whether he could safely go out to fish Platts Bank, off the Maine coast.

In spite of the continued gale warnings CHICA left port around 5:00 p.m. As it turned out, these conditions were still prevalent when Lavigne's distress signal was received shortly before 7:00 p.m. that evening. During the course of the brief 55-second exchange Lavigne indicated that the CHICA had water over the side, that he and his crew were in the process of donning survival suits, and that they would then go up to get the ship's life raft. As indicated, he ended his broadcast with his fateful "we're going over, now."

Within an hour, two Coast Guard aircraft were searching in the vicinity of the coordinates given by Lavigne. They were joined by the tanker TEXACO MONTANA which was near the scene. The search proved fruitless, the only items recovered consisting of the vessel's hatch cover and some minor debris. The bodies of the ship's crew were never found.

Brophy then brought this action in admiralty, under the Jones Act and general maritime law, for exoneration from or limitation of liability arising from the deaths of the crewmen.

After a bench trial consisting of extensive, conflicting testimony by experts theorizing as to the cause of the CHICA's sinking, the court found that the proximate cause of the casualty was the broaching of the ship as a result of adverse wind and

[*] Of the United States Court of International Trade, sitting by designation.

sea conditions. The court dismissed the suit against Brophy, ruling that a bareboat charter existed between him and DelTorto. The court then concluded that DelTorto was not responsible for this event and exonerated him from liability. This appeal ensued.

Appellants raise several issues on appeal. They allege that the CHICA was unseaworthy for a variety of reasons: (1) that it was not intended for the service for which it was used, (2) that the master and crew had not been trained to don the survival suits, (3) that the life raft was improperly stowed, and (4) that the stuffing box was defective and the freeing ports were insufficient. They also argue that the court erred in finding that the adverse wind and sea conditions were the sole cause of the sinking, and that the agreement between Brophy and DelTorto was a bareboat charter. We shall discuss these issues in inverse order.

## I. *The Charter Agreement*

■ To create a demise or bareboat charter, the owner of the vessel must completely and exclusively relinquish " 'possession, command, and navigation' thereof to the demisee." *Guzman v. Pichirilo,* 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962).

■ Under the terms of the oral agreement made in July, 1981, Brophy carried the hull insurance, and would pay for a major overhaul of the vessel's main engine, if needed. DelTorto was to obtain the protection and indemnity (P & I) insurance, pay the cost of all other repairs, and outfit the boat for gillnetting at his own expense. DelTorto would pay Brophy a flat fee of $500 per month for lease of the vessel. Both men planned to discuss and renegotiate a continuation of the charter sometime in the spring of 1982.

Appellants argue that the terms of the agreement point to a joint venture rather than a demise charter. They contend that because Brophy was to pay the hull insurance and the cost of a major engine overhaul, there was less than a complete relinquishment of required power. They also cite DelTorto's failure to obtain the P & I insurance, his failure to meet three of the lease payments, and his hiring of Lavigne to captain the boat as evidence of a breach of contract. We find these conditions to be independent of the criteria of "possession, command, and condition" enunciated in *Guzman.*

■ As *owner* of the ship, Brophy would have the most to lose if the boat were damaged, destroyed, or lost. It would therefore be in his own best interest to make certain that the hull was adequately insured. Because, in a demise charter, liability would fall on the demisee, it was not unreasonable that DelTorto would be responsible for determining what protection was adequate. As to the cost of a major engine overhaul, given the fact that this was not a long term charter, it was appropriate for Brophy to shoulder this major expense, should it arise. It could well have cost thousands of dollars and had this been DelTorto's responsibility it could destroy any financial benefit he might gain from the use of the boat in his fishing operation. The record indicates that although DelTorto did not meet several monthly payments during the harsh winter months when his boats were unable to fish regularly, he recognized that the debts were overdue and expressed his intent to pay them when he had the money. While this and the other cited breaches would certainly give Brophy the right to terminate the contract or sue for breach thereof, it is obvious from his testimony that he chose not to do so. The existence of breaches in the charter contract do not negate the *existence* of a demise. Finding that these points as raised by appellants did not affect DelTorto's actual possession, command or control over navigation, we conclude that the district court's determination that the agreement constituted a demise charter was not clearly erroneous. *See Guzman, supra,* at 703, 82 S.Ct. at 1098. Therefore, the determination that Brophy was exonerated from liability for unseaworthiness of the vessel was correct. *See Ruiz Pichirilo v. Mayso-*

*net Guzman,* 290 F.2d 812, 813 (1st Cir. 1961), *rev'd on other grounds, sub nom. Guzman v. Pichirilo, supra.*

## II. *Allegations of Unseaworthiness*

Several issues were raised regarding unseaworthiness. The evidence presented relating to the stuffing box, the freeing ports, and the life raft was contradictory. In the discussion of each problem, the court evaluated the conflicting testimony, explained its decisions regarding the credibility of witnesses, and concluded that each of these elements in issue did not make the CHICA unseaworthy.

■ This court has recognized that the clearly erroneous standard of review for factual findings enunciated in Federal Rule of Civil Procedure 52(a) presents a particularly difficult obstacle to an appellant in a situation in which the trial court has relied heavily on testimonial evidence. *O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067 (1st Cir.1986) (citing *Andersen v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). This is due to the trial court's more advantageous position when it comes to determining issues of credibility. *Id.* Where the credibility determinations are clearly explained, and the factual decisions are supported by the record, as in this case, we must uphold the trial court's judgment.

The district court did not specifically address the issue of whether the CHICA was unseaworthy because DelTorto failed to instruct Lavigne and the other crewmembers on how to don the survival suits. Because testimony and other evidence was presented on this matter, however, we will address the issue at this time.

■ In order to prove a claim of unseaworthiness, a plaintiff must show that the unseaworthy condition of the vessel was the proximate or direct and substantial cause of the seaman's injuries. *Gosnell v. Sea-Land Service, Inc.,* 782 F.2d 464, 467 (4th Cir.1986); *see also Landry v. Oceanic Contractors, Inc.,* 731 F.2d 299, 302 (5th Cir.1984); *Alverez v. J. Ray McDermott &*

*Co.,* 674 F.2d 1037, 1040, 1042 (5th Cir. 1982); *see generally* 1B Benedict on Admiralty § 28, at 3–162 to 166 (7th ed. 1980). *Arguendo* that the lack of instruction could be considered unseaworthiness, the appellants have failed to prove that the omission was the proximate cause.

■ To meet the traditional common law burden of proving proximate cause in an action based on unseaworthiness, plaintiff must show that:

> the act or omission [is] a cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces the results complained of, and without which it would not have occurred.

1B Benedict on Admiralty, *supra,* at 3–162. Given the facts before us, we are unable to conclude that, but for DelTorto's failure to instruct, the crewmen would have survived. The mayday message stated that they were donning their survival suits. These were experienced seamen. One can assume they knew how to use the safety equipment of their trade. Additionally, they did not ask for instructions on its usage or indicate that they were having any problems with the suits. Lavigne's last words were: "we're going over, now!" Since the record shows that the life raft was strapped to the topsides of the cabin, his parting phrase has two possible interpretations: first, that they had the suits on, and were going topside to get the life raft, or second, that the boat itself was capsizing at that moment. Accepting either interpretation further defeats the needed causal relationship: they either were wearing the suits and were heading out of the cabin, in which case they had no problem donning the suits, or the boat immediately capsized in which case it was too late to get out and the issue of the suits is irrelevant.

Moreover, it could just as easily be said that the crew did not evaluate the danger of their situation in time to allow themselves to properly prepare for abandoning the vessel. This, of course, is all speculation, but it serves to show that the survival

suit issue as a proximate cause of the crewmembers' deaths is also pure conjecture.

Most importantly, however, considering that none of appellants' bodies nor survival suits was recovered, it is absolute speculation, devoid of any probative evidence, to argue that they in fact failed to don this equipment. If appellants cannot on this record establish that the decedents did *in fact* fail to don the survival suits, the issue of whether or not they received instructions is irrelevant.

### III. *The Cause of the CHICA's Sinking*

The trial court found that the only plausible explanation for the CHICA's sinking was that it broached while underway as a result of adverse wind and sea conditions. Based primarily upon its acceptance of two expert witnesses' testimony, the court adopted the following description of what most likely happened:

> Based on Cardone's sea state 'hindcast,' and other evidence in the record, Bijhouwer concluded that CHICA was lost as a result of instability caused by riding the crest of a wave for over five seconds in following seas. Based on the distance CHICA had covered and the approximate time of its departure from the Portland Light Buoy, Bijhouwer calculated that CHICA was traveling at the approximate rate of 9 knots. The average wave height of 12.4 feet was greater than the 6.7-foot depth of CHICA's hull. Bijhouwer calculated that CHICA, traveling at 9 knots, when poised for over five seconds on the crest of a wave that was traveling from 9 to 14 knots, became partially unsupported by the water and lost stability, rolling to the port side since the waves would be hitting slightly on the starboard quarter. His opinion was that the vessel then took water over the rail, further reducing its ability to right itself, and was put completely upside down by a later wave.

Reviewing the record as a whole, we do not find this to be clearly erroneous.

What is very clear from the record is that the master of the CHICA independently decided to set sail notwithstanding the gale warnings that had been posted all day, that vessels similar to the CHICA would not ordinarily leave port in those circumstances, and that he had been advised by another captain, who had returned earlier, that conditions were unfit to go out. While the court did state that the CHICA was not designed to handle such adverse weather conditions, in view of its other findings we do not interpret this to mean that the vessel was *inherently* unseaworthy. On the contrary, this language stands for the proposition that a prudent captain would not have left port in this particular vessel in these weather conditions. We therefore conclude that the district court's explanation has sufficient support in the record.

*Affirmed.*