DONNA CURCURU[1] *vs.* ROSE'S OIL SERVICE, INC.
(and four companion cases[2]).

No. 04-P-1364.

Suffolk. January 9, 2006. - April 25, 2006.

Present: LAURENCE, SMITH, & TRAINOR, JJ.

*Negligence,* Vessel, Repairs, Causation, Comparative, Joint tortfeasor.
*Indemnity. Contract,* Indemnity, Warranty. *Joint and Several Obligation.*

In a civil action brought by the estates of four crew members of a fishing vessel alleging negligence against the shipyard that performed repairs on the propeller and stern tube stuffing box of the vessel in the months preceding its sinking, the evidence, viewed in the plaintiffs' favor, supported the jury's finding that the shipyard's negligence caused the crew's deaths when the vessel sank, where the jury reasonably could have found, based on the evidence offered at trial and the reasonable inferences that could be drawn therefrom, that water flooding the vessel's fish hold from the stern tube stuffing box was more likely than not responsible for the manner in which the vessel capsized and sank [207-209]; and where there was sufficient evidence from which the jury could infer that the crew were on the vessel and died as a result of the fish hold flooding, and the vessel unexpectedly capsizing and sinking [209-210].

In a civil action brought by the owner of a fishing vessel against the shipyard that performed repairs on the propeller and stern tube stuffing box of the vessel in the months preceding its sinking, the jury's finding that the owner was fifty percent negligent in causing the loss of the vessel did not bar the owner from recovering against the shipyard under the implied warranty of workmanlike service, where the implied warranty of workmanlike service is a creature of Federal maritime law that is contractual in nature, and therefore, tort elements of negligence and relative fault did not play a role in the shipyard's liability for indemnifying the owner [210-212]; further, the owner's relative degree of fault did not reduce its right to indemnification [212-215].

[1]Individually and as administratrix of the estate of Nicholas Curcuru.

[2]Joanne Giovinco, individually and as administratrix of the estate of Peter Giovinco, *vs.* Rose's Oil Service, Inc.; Vera Curcuru, individually and as administratrix of the estate of Salvatore Curcuru, *vs.* Rose's Oil Service, Inc.; Maria Ramos Carrapichosa, individually and as administratrix of the estate of Manuel F. G. Carrapichosa, *vs.* Rose's Oil Service, Inc.; Uncle Sam of '76, Inc. *vs.* Rose's Oil Service, Inc.

In a civil action sounding in admiralty, in which the plaintiffs settled with one
    tortfeasor for an amount that was less than fifty percent of the judgments,
    the other tortfeasor was not liable for the difference between the amount of
    the judgments and the amount of the settlements, but rather only for its
    proportionate share of the judgments. [215-217]

CIVIL ACTIONS commenced in the Superior Court Department
on September 25, 1996; November 15, 1996; April 16, 1997;
August 8, 1997; and August 27, 1997, respectively.

After consolidation, the cases were tried before *Carol S. Ball,*
J., and a motion for judgments notwithstanding the verdicts or
for a new trial was heard by her.

*Thomas E. Clinton (Robert E. Collins* with him) for the
defendant.

*Joseph G. Abromovitz* for Donna Curcuru & another.

*Stephen M. Ouellette & Brian S. McCormick,* for Vera Cur-
curu & another, were present but did not argue.

SMITH, J. The F/V Italian Gold, a fishing vessel out of Glouc-
ester, sank during a gale in the Atlantic Ocean on September 5,
1994. The four crew members were lost. The surviving spouses,
both individually and as administratrices of their respective
husbands' estates (collectively, the estates), and the shipowner,
Uncle Sam of '76, Inc. (Uncle Sam), sued Rose's Oil Service,
Inc. (Rose's Oil), the shipyard that performed repairs on the
vessel in the months preceding the Italian Gold's last voyage.
The cases were tried to a jury, which returned verdicts in favor
of the plaintiffs. Rose's Oil appealed.[3]

1. *Procedural history.* The estates filed their respective
complaints in Superior Court in 1996 and 1997, alleging
negligence against Rose's Oil under the Death on the High Seas
Act (DOHSA), 46 U.S.C. App. §§ 761 et seq. (2000),[4] and
general maritime law. Uncle Sam sued Rose's Oil in Superior
Court for negligence, breach of the implied warranty of

---

[3]See the procedural history, *infra,* for a discussion of the previous appeal in
this case, *Curcuru* v. *Rose's Oil Serv., Inc.,* 441 Mass. 12 (2004).

[4]DOHSA permits a Federal cause of action for survivors of a person whose
death is "caused by wrongful act, neglect, or default occurring on the high
seas." Actions to recover damages under DOHSA may be brought in State
court. *Bugden* v. *Trawler Cambridge, Inc.,* 319 Mass. 315, 318 (1946).

workmanlike service, and violation of G. L. c. 93A. The five actions were consolidated.

Uncle Sam also initiated a limitation of liability proceeding, a complaint in admiralty pursuant to 46 U.S.C. App. § 185 (2000), in the United States District Court for the District of Massachusetts.[5] The estates settled with Uncle Sam in that action, reportedly for the limits of Uncle Sam's liability insurance coverage. Because the settlement fund was insufficient to compensate the four estates to the full extent of their damages, the Federal District Court judge ordered an equitable allocation of the available funds among the four estates, taking into account the survivors' respective pecuniary losses, as well as the pain and suffering of the decedents before their deaths. See *In re Complaint of Uncle Sam of '76, Inc.*, 928 F. Supp. 64 (D. Mass. 1996).

In the Superior Court actions against Rose's Oil, the estates and the shipowner essentially claimed that Rose's Oil negligently repaired the ship's propeller and stern tube stuffing box, resulting in excessive leaking that flooded the ship's fish hold when the ship encountered rough seas and that caused the vessel to capsize and sink. Rose's Oil blamed the ship's flooding and sinking on the weather conditions, positing that wave action damaged the hull and that a forty-foot wave hit the pilot house, knocking out the windows and door and causing the crew quarters and other areas below to flood.

Before trial, Rose's Oil challenged the estates' rights to a jury trial on their DOHSA claims. The judge ruled against the estates on the issue, but in the interest of judicial economy, submitted the estates' claims to the jury for an advisory opinion. After a fifteen-day trial, including five days of deliberation, the jury found in favor of the estates and Uncle Sam, but found Uncle Sam fifty percent comparatively negligent. The judge then issued her own findings of fact and rulings of law on the estates' DOHSA claims, finding Rose's Oil negligent in its repairs to

[5]The Limitation of Shipowners' Liability Act, 46 U.S.C. App. §§ 181-189 (2000), permits a shipowner to file a complaint in Federal court and seek to limit its liability to the value of the vessel and its freight for any liability arising out of a given voyage. Parties entitled to damages against the shipowner are named as defendants in a limitation of liability complaint. See 29 Moore's Federal Practice § 708.01 (3d ed. 2005).

the stern tube stuffing box, but ruling in Rose's Oil's favor on the issue of causation.[6] The estates appealed, separate and final judgments having been entered against them. In *Curcuru* v. *Rose's Oil Serv., Inc.*, 441 Mass. 12, 20-21 (2004), the Supreme Judicial Court held that the estates were entitled to a jury trial on their DOHSA claims, pursuant to the "savings clause" of 46 U.S.C. App. § 767 (2000). Judgments were then entered for the estates. Judgment for Uncle Sam was also entered, which included recovery against Rose's Oil for the value of the vessel and indemnification for amounts paid in settlement to the estates in the Federal limitation of liability action.

The trial judge had previously denied Rose's Oil's motion for judgments notwithstanding the verdict as to Uncle Sam, and following entry of judgments for the estates, the judge also denied Rose's Oil's motion for judgments notwithstanding the verdicts or for a new trial as to the estates. Regarding the fact that her own findings were at odds with the jury verdicts, the judge reiterated her respect for the "demonstrably conscientious and intelligent jurors" and concluded that reasonable minds could differ on the issue of what caused the crew's deaths.

Rose's Oil appealed from the judge's denial of its motion for judgments notwithstanding the verdicts and from the award to Uncle Sam for indemnification under the implied warranty of workmanlike service. Two of the estates cross-appealed[7] from the judge's ruling that Rose's Oil was liable for only fifty percent of the estates' damages, rather than the full amounts of their damages minus the amounts of the settlements paid to them by Uncle Sam.

2. *Facts.* We summarize the facts as the jury could have found them. The Italian Gold was built in 1979 for fishing in the North Atlantic. The ship was constructed to withstand fifty-foot waves and sixty mile per hour winds, and the original owners installed approximately twenty-eight tons of concrete ballast in the lower portion of the ship to improve its stability and make the vessel more seaworthy. Uncle Sam purchased the Italian Gold in 1984.

---

[6] The judge ruled against Uncle Sam on its claim under G. L. c. 93A.

[7] The estates of Manuel F. G. Carrapichosa and Salvatore Curcuru did not join in the cross appeal.

In April, 1994, the Italian Gold lost its propeller at sea. On April 17, Frank Rose IV, of Rose's Oil, installed a replacement. The propeller on the Italian Gold was attached to a long shaft that extended through a shaft alley that ran below the ship's fish hold, and exited the shaft alley through a stuffing box into a stern tube, which went through and outside the ship's hull. By June, the vessel's stern tube stuffing box had started leaking, more than the normal drip needed for lubrication, and by late July, the leaking had escalated to a steady stream. One of the ship's captains, Robert MacDonald, who also served as the ship engineer, felt vibration coming from the area of the Italian Gold's propeller shaft when he was aboard the vessel for a fishing trip in late July. In the ten years Uncle Sam had owned the Italian Gold prior to replacement of the propeller, the ship had experienced no major problems and no problems with excessive leaking through the stern tube stuffing box.

On July 26, 1994, Rose's Oil undertook a second repair, this time to correct the excessive leaking from the stern tube stuffing box into the fish hold. Rose's Oil's mechanic, Bruce Figuerido, attempted to repair the leak by adding more packing to the existing packing material in the stuffing box. When he started the work, he discovered that he had brought the wrong size packing with him to the boat; five-eighths inch instead of the three-quarters inch packing that the Italian Gold's stuffing box required. Instead of retrieving the correct size packing from the shop, he hammered the five-eighths inch packing to flatten it, and inserted it into the stuffing box. He neglected to spin the shaft to seat the packing, as standard practice required. He then tightened the area so that no water was leaking around the shaft; however, this deprived the shaft of necessary lubrication.

According to the testimony of the estates' expert, William Eident, a marine engineer and professor from the Massachusetts Maritime Academy, Rose's Oil was negligent when it replaced the propeller in April, 1994, and failed at that time to check, with a dial indicator, whether the propeller shaft was bent. Both Eident and Frank Rose testified that the most likely explanation in these circumstances for the loss of Italian Gold's propeller, and the propeller nut that held it in place, was fishing gear entanglement. Rose testified that when he replaced the propel-

ler, he checked the shaft rotation visually to ensure the shaft was not bent. But Eident testified that the degree of shaft irregularity need only be .00335 inches, or fingernail width, to cause the propeller to spin irregularly and cause the packing material in the stern tube stuffing box to wear out prematurely. As it turned out, by the end of June, the stern tube stuffing box had begun to leak.

Eident further testified that the repair performed by Rose's Oil on the stern tube stuffing box violated good maritime practice as well as the manufacturer's guidelines for installing the packing material. Eident testified that in addition to using the wrong size material, Rose's Oil should have completely removed the old packing material and replaced it with new material, rather than simply adding packing material. Eident opined that given the method by which Rose's Oil attempted to repair the stuffing box, the repairs would have failed within a matter of days. As it happened, shortly after the July 17 repairs, the Italian Gold's engineer found it necessary to add more packing to the stern tube stuffing box.

On August 30, 1994, the Italian Gold departed Gloucester on a fishing trip with four crew members aboard: Captain Nicholas Curcuru, engineer Peter Giovinco, and deck hands Manuel Carrapichosa and Salvatore Curcuru (no relation to the captain). Guiseppe DiMaio, Uncle Sam's president, spoke with the captain daily. Their last communication was on the afternoon of September 4, 1994, when DiMaio and the ship's captain and engineer discussed the forecast of a possible storm, and the decision was made to stop fishing and bring all gear onboard. By 6:00 A.M. on the morning of September 5, 1994, a gale[8] was approaching at about sixty nautical miles to the south of the ship, and the highest waves in the area of the ship were averaging twenty to twenty-one feet, still well within the ship's designed capability to withstand.

At 6:07 A.M. on September 5, 1994, the United States Coast Guard received a distress signal from the Italian Gold, triggered by the ship's emergency position indicating radio beacon, or EPIRB. The EPIRB was located at the rear of the pilot house,

---

[8]A gale was defined for the jury as "winds of forty-eight miles [per] hour."

twenty feet above the water, and could be activated by hand or by hystrostatic pressure. A Canadian Armed Forces rescue plane was sent to the area. Arriving at the ship's location at 6:53 A.M., the plane's navigator, Captain Peter Fedora, observed the Italian Gold listing seventy-five degrees on its port side, with no sign of the crew. Within five minutes of the plane's arrival, the ship capsized suddenly, and a minute later sank, bow first. Captain Fedora testified that he saw no damage or buckling of the ship's hull after it rolled over. The plane remained in the area for another four hours as the weather conditions worsened, but no crew members from the Italian Gold were spotted, and no life boat or survival gear was seen in the water.

John Gilbert, the naval architect and marine engineer who created the design used to build the Italian Gold, testified as an expert witness for the plaintiffs at the trial. He testified that the manner in which the Italian Gold sank, by capsizing and then sinking bow first, had to have been caused by the flooding of the ship's fish hold. The fish hold was a large compartment at the bottom of the ship, constituting almost one third of the vessel, roughly twenty-five feet long and twenty-four feet wide. It was intended to be watertight, except for the small amount of water allowed to seep through the stuffing box for lubrication, and was accessible to the crew only through a hatch on the deck above. Electric pumps were used to empty accumulated water (consisting of water from the stuffing box or melting ice) from the shaft alley and fish hold as needed. Gilbert testified that the pumps would only operate if the ship's electrical system was functioning; without the pumps, any excessive amount of water entering the stuffing box and shaft alley would build up and flood the fish hold.

On October 13, 1994, the Coast Guard conducted underwater filming of the Italian Gold, which it located on the ocean floor at a depth of 650 feet. The videotape showed that the ship's hull was buckled on both sides; two of the portside pilot house windows, the door, and electrical controls were damaged; the hatch to the fish hold was closed; and the lifeboat was out of its canister on the deck, partially folded and uninflated. Gilbert, the ship's designer, testified that the hull damage was likely caused by the impact of the ship hitting the ocean floor. This opinion

was supported as well by the testimony of Captain Fedora who, at the time that the ship capsized, did not observe the damage to the hull that was plainly visible in the underwater videotape. Gilbert also testified that the ship was designed to weather fifty-foot seas. He further explained that the ship would not have capsized and sunk bow first from the damage to the pilot house, as shown in the videotape, and that any flooding from that part of the ship would have caused the ship to sink, if at all, by going straight down.

3. *The denial of the motion for judgments notwithstanding the verdicts.* Rose's Oil argues that its motion for judgments notwithstanding the verdicts was wrongly denied because the evidence did not support the jury's findings that Rose's Oil's negligence caused the Italian Gold to sink and the crew to perish. Rose's Oil acknowledges that in reviewing the denial of a motion for judgment notwithstanding the verdict, our standard is "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor' " of the estates. *Boothby* v. *Texon, Inc.,* 414 Mass. 468, 470 (1993), quoting from *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978).

Because the issues of negligence and causation turned, in large part, on the conflicting testimony of the parties' expert witnesses and the inferences to be drawn therefrom, it was for the jury to decide which explanations of the ship's sinking and the loss of the crew were the more credible. See *Brophy* v. *Lavigne,* 801 F.2d 521, 524 (1st Cir. 1986). See also *Lama* v. *Borras,* 16 F.3d 473, 478 (1st Cir. 1994) ("[w]hile not allowed to speculate, the fact-finder is of course free to find some experts more credible than others"). For that reason, Rose's Oil's reliance on the judge's findings, issued before the Supreme Judicial Court ordered entry of judgments for the estates on the jury verdicts, is not persuasive. The judge herself acknowledged that reasonable minds could differ in deciding which version of events was the more probable.

It is true, as Rose's Oil points out, that much of the evidence presented to the jury in this case was circumstantial. But the evidence here stands in sharp contrast to that offered in *Poulis-Minott* v. *Smith,* 388 F.3d 354, 366-367 (1st Cir. 2004), upon

which Rose's Oil relies. In that case, the only evidence offered as to what caused the death of the boat's sole occupant was the Coast Guard's receipt of two EPIRB distress signals and the recovery of the fisherman's body whose cause of death was determined to have been drowning. *Id.* at 362, 366. The shipowner's motion for summary judgment was allowed there because the estate's claim that the vessel was not seaworthy, in those circumstances, was based only on "improbable inferences and unsupported speculation." *Id.* at 366, quoting from *LeBlanc* v. *Great American Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994).

The trial record in this case confirms that the jury's findings were not based on guesswork and groundless inference, as Rose's Oil contends. Here, evidence was presented of problems with the ship's propeller and the stern tube stuffing box in the months preceding the ship's sinking. Rose's Oil's employee testified about the repairs he made to the stuffing box a little more than a month before the vessel sank, the quality of which the jury could properly have found to be negligent. The jury heard expert testimony about the probable effects of the negligent repairs performed by Rose's Oil in both April and July, 1994, on the operation of the stern tube stuffing box.[9]

Also for the jury to consider was the rescue plane navigator's eyewitness account of the sinking of the ship. His personal

---

[9]Rose's Oil complains that the judge abused her discretion in permitting Eident's testimony that the Italian Gold's propeller shaft was likely bent in April, 1994, because that testimony lacked factual basis. Our review of the record indicates that Eident had sufficient facts to testify as to the probability that the propeller was bent. See, e.g., *Commonwealth* v. *DelValle*, 443 Mass. 782, 792 (2005), quoting from Liacos, Brodin, & Avery, Massachusetts Evidence § 7.6.4, at 390 (7th ed. 1999) ("[w]here an expert's opinion is sufficiently grounded in the evidence, that certain facts were unknown to the expert . . . does not render the testimony inadmissible, but rather goes to the weight . . . of the evidence"). Eident, as well as Rose, who installed the replacement propeller, testified that the loss of the propeller was most likely due to fishing gear entanglement. Eident testified that in those circumstances, Rose should have determined, with a dial indicator, whether the shaft had been bent in the process; Rose, instead, conducted only a visual inspection. Evidence that after the propeller was replaced, the stuffing box began to leak excessively and vibration consistent with a bent shaft was noticed by one of the captains, provided Eident with sufficient basis to opine that the propeller shaft likely had been bent when the propeller fell off.

observations were supplemented by expert testimony about the weather and sea conditions prior to and at the time the ship sank, as well as the testimony of the ship's designer concerning how the ship would respond to those conditions. The jury were also presented with evidence as to how various sections of the vessel were sealed off from other areas, the limited ways in which the fish hold could flood from water entering other compartments of the ship, and the kind of flooding that would cause the ship to capsize and sink as it did. In addition, the jury viewed portions of the underwater videotape and heard expert testimony explaining the likely cause of the ship's observable damage.[10]

Based on the evidence offered at trial and the reasonable inferences that could be drawn therefrom, and deferring to the jury's assessment of credibility and weight accorded the evidence, the jury reasonably could have found that water flooding the fish hold from the stern tube stuffing box was more likely than not responsible for the manner in which the vessel capsized and sank.

Rose's Oil further argues that even if the evidence was sufficient to establish that the ship flooded and sank as a result of Rose's Oil's negligent repairs, the jury's finding that the crew died as a result of the ship's sinking was pure conjecture. Rose's Oil posits that the crew could have perished before the ship went down, as a result of the weather conditions or the flooding of the pilot house and crew quarters, so that the negligent repairs that caused the ship to flood and sink did not actually cause their deaths.

But the jury heard testimony that without the flooding of the fish hold, the Italian Gold was designed to withstand far worse than the gale conditions observed at the time the vessel sank. Viewing the evidence in the estates' favor, the jury reasonably could infer that the crew, aware that the ship ordinarily would stay afloat in the weather conditions encountered, stayed with the ship. The jury could reasonably infer from the evidence that

---

[10]This included the damage to the pilot house and the electrical panel, the fact that the hatch to the fish hold was closed, and the likelihood that the symmetrical hull damage was caused when the sinking ship, full of flood water by that time, hit the ocean floor.

by 6:07 A.M., with the ship listing to port side and electrical power lost, a crew member manually activated the EPIRB, and that with the lifeboat unusable, the crew still remained on board at that time. As such, there was sufficient evidence from which the jury could infer that the crew were on the ship and died as a result of the fish hold flooding and the ship unexpectedly capsizing and sinking. See, e.g., *Cooper* v. *Loper*, 923 F.2d 1045, 1050 (3d Cir. 1991) ("In the absence of any direct evidence, . . . the [factfinder] was entitled to draw its own conclusion about the accident's cause from the available circumstantial evidence").

We conclude that the evidence, viewed in the plaintiffs' favor, supported the jury's finding that Rose's Oil's negligence caused the crew's deaths when the Italian Gold went down.

4. *Uncle Sam's negligence as a bar to indemnification.* The jury found that Rose's Oil breached its warranty of workmanlike service to Uncle Sam in making repairs to the ship and that the breach was a substantial factor in causing Uncle Sam's loss. Rose's Oil maintains that because Uncle Sam was found to be fifty percent comparatively negligent in causing the loss, Rose's Oil has no duty to indemnify Uncle Sam. Rose's Oil insists that Uncle Sam's negligence bars Uncle Sam from any recovery under the implied warranty of workmanlike service.

The implied warranty of workmanlike service is a creature of Federal maritime law, established by the United States Supreme Court in *Ryan Stevedoring Co.* v. *Pan-Atlantic S.S. Corp.*, 350 U.S. 124 (1956).[11] There, the Supreme Court held that an oral agreement to perform stevedoring operations between a stevedore and a shipowner "necessarily includes petitioner's obligation, not only to stow the pulp rolls, but to stow them properly and safely." *Id.* at 133. "It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product." *Id.* at 133-134. The Supreme Court has made clear that a cause of ac-

---

[11]Thus, while this action was brought in State court, we apply general maritime law, "as developed and declared" by the United States Supreme Court, and supplemented by Federal common-law sources. *Jansson* v. *Swedish American Line*, 185 F.2d 212, 216-217 (1st Cir. 1950). See *Clancy* v. *Mobil Oil Corp.*, 906 F. Supp. 42, 47 (D. Mass. 1995).

tion under the implied warranty of workmanlike service was contractual in nature, and that tort elements of negligence and relative fault did not play a role in the contractor's liability for indemnifying the shipowner. See *id.* at 132-133; *Weyerhaeuser S.S. Co.* v. *Nacirema Operating Co.*, 355 U.S. 563, 568-569 (1958); *Italia Societa per Azioni di Navigazione* v. *Oregon Stevedoring Co.*, 376 U.S. 315, 321-322 (1964).[12] As a consequence, the shipowner's own negligence did not affect its entitlement to indemnification under an implied warranty claim. *Id.* at 320.[13]

The United States Court of Appeals for the First Circuit has extended the implied warranty of workmanlike service to agreements between shipowners and contractors performing ship repairs. See *Parks* v. *United States*, 784 F.2d 20, 26-28 (1st Cir. 1986); *La Esperanza de P.R., Inc.* v. *Perez y Cia. de P.R., Inc.*, 124 F.3d 10, 16-17 (1st Cir. 1997). In so doing, the court has reiterated that ordinarily, the shipowner's negligence would not bar its entitlement to indemnification for breach of the implied warranty, as set out in *Ryan Stevedoring Co.* v. *Pan-Atlantic S.S. Co.*, 350 U.S. at 132-133.[14] See *Maritime Overseas Corp.* v. *Northeast Petroleum Indus., Inc.*, 706 F.2d 349, 353 (1st Cir. 1983). The court did acknowledge that an exception might be made when the shipowner's conduct prevented the contractor from doing a workmanlike job. *Ibid.*, citing to *Gator Marine Serv. Towing, Inc.* v. *J. Ray McDermott & Co.*, 651 F.2d 1096, 1100 (5th Cir. 1981) ("negligence on the part of the shipowner which prevents the stevedore from doing a workmanlike job

[12]The doctrine extended from the shipowner's nondelegable duty to provide a seaworthy ship to its crew, which rendered the shipowner itself liable for personal injuries, without reference to fault. See *Usner* v. *Luckenbach Oversees Corp.*, 400 U.S. 494, 498 (1971).

[13]In 1972, the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 et. seq., was amended, eliminating indemnification claims by shipowners against stevedoring companies and providing more generous benefits to injured longshoremen. See *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U.S. 256, 262 (1979). However, indemnity for breach of the implied warranty for workmanlike service has remained a remedy in actions involving shipowners and other maritime contracts.

[14]For simplicity's sake, we will follow the lead of the Federal courts and refer to indemnification pursuant to a breach of the implied warranty of workmanlike service, as established in *Ryan Stevedoring Co.* v. *Pan-Atlantic S.S. Co.*, *supra*, as Ryan indemnity.

. . . may preclude indemnity"). For example, in *Turner* v. *Global Seas, Inc.*, 505 F.2d 751, 753-754 (6th Cir. 1974), the shipowner refused to permit the stevedoring companies to adjust improperly loaded cargo before the ship set sail, and thus, having prevented the stevedore from performing its contract in a workmanlike manner, was precluded from recovering under Ryan indemnity principles. See *Oglebay Norton Co.* v. *CSX Corp.*, 788 F.2d 361, 366 (6th Cir.), cert. denied, 479 U.S. 849 (1986), and cases cited.

The facts here do not support an outright bar to Uncle Sam's right to Ryan indemnity. The evidence overwhelmingly demonstrated that Rose's Oil, alone, undertook to perform the repairs on the stuffing box, and that Uncle Sam did not prevent Rose's Oil from performing those repairs in a workmanlike manner. The fact that the jury found Uncle Sam to be fifty percent negligent in causing the sinking of the ship did not mean that Uncle Sam prevented Rose's Oil from performing the repairs to the ship in a workmanlike manner. It is the shipowner's conduct with respect to the contractor's performance of the contract, and not with respect to the crew's deaths, that should be the focus of our inquiry in determining whether the shipowner prevented the contractor from performing in a workmanlike manner. See *Oglebay Norton Co.* v. *CSX Corp.*, 788 F. 2d at 366.

Rose's Oil argues that Uncle Sam should have discovered Rose's Oil's defective repairs; however, any such failure does not free Rose's Oil from its obligation to perform in a workmanlike manner. "[A]s between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense." *Ryan Stevedoring Co.* v. *Pan-Atlantic S.S. Corp.*, 350 U.S. at 134. See *Parks* v. *United States*, 784 F.2d at 26.

We conclude that the judge did not err in ruling that in accordance with Federal maritime law, Uncle Sam was entitled to indemnification under the implied warranty of workmanlike service.

5. *Uncle Sam's negligence as reducing the amount of indemnification.* Rose's Oil next argues that even if Uncle Sam's recovery against Rose's Oil under Ryan indemnity is not

completely barred by Uncle Sam's own negligence, the shipowner's recovery should be reduced in proportion to its relative degree of fault. Here, the jury found Uncle Sam to be fifty percent at fault on its separate claim for negligent repairs against Rose's Oil. While Rose's Oil acknowledges that the Court of Appeals for the First Circuit recognizes a cause of action for Ryan indemnity in ship repair contracts, Rose's Oil relies on the *first* part of the following excerpt from *La Esperanza de P.R., Inc.* v. *Perez y Cia. de P.R., Inc.*, 124 F.3d at 17, to support its argument that Uncle Sam's recovery should be treated under comparative fault principles:

> "while the implied warranty of workmanlike performance 'parallels a negligence standard *rather than imposing [the] strict liability*' that attaches to implied warranties in land-based contracts under the Uniform Commercial Code, see [*Employers Ins. of Wausau* v. *Suwanee River Spa Lines, Inc.*, 866 F.2d 752, 763 n. 17 (5th Cir.), cert. denied sub nom. *Employers Ins. of Wausau* v. *Avondale Shipyards, Inc.*, 493 U.S. 820 (1989)],' a shipowner may receive indemnity from a marine contractor for breach of implied warranty of workmanlike service, albeit that such performance was done without negligence.' *SS Amazonia* v. *New Jersey Export Marine Carpenters, Inc.*, 564 F.2d 5, 8 (2d Cir. 1977)." (Emphasis added by Rose's Oil.)

We do not think the passage above helps Rose's Oil's cause. Neither the Supreme Court nor the First Circuit has articulated a maritime rule that calls for apportionment of an award for breach of the implied warranty based on the comparative fault of the contracting parties. For example, in *Italia Societa per Azioni di Navigazione* v. *Oregon Stevedoring Co.*, 376 U.S. at 323-324, the Supreme Court observed that while the stevedoring company was free of negligence in supplying a defective rope that caused injury to a crew member, the stevedore was still liable to the shipowner for indemnification under its implied warranty. It was not the contractor's negligence that triggered Ryan indemnity, see *La Esperanza de P.R., Inc.* v. *Perez y Cia. de P.R., Inc.*, 124 F.3d at 17, but rather its contractual undertaking and its control over the work performed. "Application of Ryan indemnity has 'rested . . . on elements of expertise,

control, supervision and ability to prevent accidents.' " *Maritime Overseas Corp.* v. *Northeast Petroleum Indus., Inc.*, 706 F.2d at 353-354, quoting from *Fairmont Shipping Corp.* v. *Chevron Intl. Oil Co.*, 511 F.2d 1252, 1257 (2d Cir.), cert. denied, 423 U.S. 838 (1975). See *Parks* v. *United States*, 784 F.2d at 26-27. As the Supreme Court explained in *Italia Societa per Azioni di Navigazione* v. *Oregon Stevedoring Co.*, 376 U.S. at 324:

> "[L]iability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury. Where, as here, injury-producing and defective equipment is under the supervision and control of the stevedore, the shipowner is powerless to minimize the risk; the stevedore is not."

Just as the absence of negligence will not excuse the contractor from fully indemnifying the shipowner under Ryan indemnity, so, too, we decline to interpret the general maritime law as providing for a reduction in the contractor's obligation to indemnify by virtue of the shipowner's negligence.

Rose's Oil points out that in certain jurisdictions, where the injured crew member has brought a negligence claim against the shipowner and the shipowner's relative fault is established, negligence principles have been applied to reduce the amount of the shipowner's indemnity award from the contractor in proportion to the parties' relative fault. On our reading of the cases that favored the application of comparative fault to an indemnity award, we note that those courts rejected Ryan indemnity outright, for various reasons. They resorted instead to general maritime tort law and comparative fault to apportion the liability between the shipowner and the maritime contractor. See, e.g., *Knight* v. *Alaska Trawl Fisheries, Inc.*, 154 F.3d 1042, 1045-1046 (9th Cir. 1998), and cases cited.[15]

The First Circuit, however, is among those jurisdictions that

---

[15]See, e.g., *Loose* v. *Off-Shore Navigation, Inc.*, 670 F.2d 493, 500 (5th Cir. 1982) (rejecting earlier maritime rule of dividing damages equally between tortfeasors, and instead applying comparative fault principles to damages in maritime torts); *Smith & Kelly Co.* v. *S/S Concordia TADJ*, 718 F.2d 1022, 1028-1029 (11th Cir. 1983) (holding that Ryan indemnity was limited to longshore worker cases, and applying comparative fault to liability for injured crew members); *Black* v. *Red Star Towing & Transp. Co.*, 860 F.2d 30, 34 (2d Cir. 1988) (no contract found between shipowner and contractor to support

have continued to distinguish Ryan indemnity from claims based on negligence in actions brought by shipowners arising from the performance of maritime contracts. See, e.g., *Parks* v. *United States*, 784 F.2d at 26-27. And, as we discussed above, in *Maritime Overseas Corp.* v. *Northeast Petroleum Indus., Inc.*, 706 F.2d at 353, the court expressly provided that the shipowner's negligence was not a bar to Ryan indemnity unless it prevented the contractor from doing a workmanlike job. See *Parks* v. *United States*, 784 F.2d at 26 & n.7. Moreover, we reject Rose's Oil's argument, in reliance on the reasoning of the United States Court of Appeals for the Ninth Circuit in *Knight* v. *Atlantic Trawl Fisheries, Inc.*, 154 F.3d at 1045, that the nature of the victim's cause of action against the shipowner dictates the shipowner's right to Ryan indemnity. The First Circuit has expressly stated that the shipowner's right to Ryan indemnity was "contractual in nature, existing independently of tort," and did not depend on whether the victim's claim against the shipowner was for negligence or for lack of seaworthiness. See *Feliciano* v. *Compania Transatlantica Espanola, S.A.*, 411 F.2d 976, 978 (1st Cir. 1969).

Given the First Circuit's continued recognition of the distinction between recovery in maritime tort, which is concerned with fault,[16] and recovery under the implied warranty of workmanlike service in maritime contracts, which is concerned with control over the work, we reject the notion that comparative fault should apply to the shipowner's recovery when the implied warranty of workmanlike service has been breached and a crew member injured as a result. See, e.g., *Maritime Overseas Corp.* v. *Northeast Petroleum Indus., Inc.*, 706 F.2d at 353; *Parks* v. *United States*, 784 F.2d at 26; *La Esperanza de P.R., Inc.* v. *Perez y Cia. de P.R., Inc.*, 124 F.3d at 16-17.

Accordingly, based on the record before us and on well-established maritime law in this jurisdiction, we hold that Uncle Sam's right to indemnification from Rose's Oil was neither barred, nor reduced, on account of Uncle Sam's own negligence.

6. *The cross appeals.* The estates of Nicholas Curcuru and

---

implied warranty claim).

[16]Indeed, the judge here ruled that Uncle Sam's negligence precluded recovery in indemnity against Rose's Oil on Uncle Sam's maritime tort claim.

Peter Giovinco (collectively, the Curcuru and Giovinco estates) filed cross appeals from the judge's order that, consistent with the jury's finding that Uncle Sam and Rose's Oil were each fifty percent at fault for the ship's sinking, judgment should enter against Rose's Oil for fifty percent of the jury's verdicts. Because the estates settled with Uncle Sam for an amount that was less than fifty percent of the judgments, the Curcuru and Giovinco estates contend that Rose's Oil should be liable for the difference between the amount of the judgments and the amount of the settlements they received from Uncle Sam. In other words, they argue that Rose's Oil should be held jointly and severally liable for the full amount of the verdicts, rather than proportionately liable for its percentage of the fault.

The law in this regard is clear. While multiple tortfeasors would ordinarily be jointly and severally liable for a judgment, the United States Supreme Court, in *McDermott, Inc.* v. *Am-Clyde*, 511 U.S. 202, 220-221 (1994), held that when the plaintiff in an admiralty case settled with one joint tortfeasor, the remaining nonsettling tortfeasor was liable only for its proportionate share of the judgment. As the Court explained, "[w]hen the limitations on the plaintiff's recovery arise from outside forces, joint and several liability makes the other defendants, rather than an innocent plaintiff, responsible for the shortfall." *Id.* at 221. However, "the proportionate share rule announced in this opinion applies when there has been a settlement." *Ibid.* In such cases, the Court reasoned, "the plaintiff's recovery against the settling defendant has been limited not by outside forces, but by its own agreement to settle." *Ibid.*

The Curcuru and Giovinco estates argue that the usual characteristics of a settlement that provided the rationale for the Supreme Court's adoption of the proportionate share rule in *McDermott, Inc.* v. *AmClyde*, *supra*, were not present in this case. The Curcuru and Giovinco estates insist that their decision to settle with Uncle Sam was not truly voluntary, because they merely settled for the limits of Uncle Sam's insurance policy. In this way, they contend their position was more analogous to the situation mentioned by the First Circuit in *Joia* v. *Jo-Ja Serv. Corp.*, 817 F.2d 908, 917 (1st Cir. 1987), cert. denied sub nom.

*Boat Niagara Falls, Inc.* v. *Joia,* 484 U.S. 1008 (1988), where joint and several liability was suggested as the better approach when an injured crew member's recovery against one tortfeasor might be constrained by that defendant's ability to limit its liability under 46 U.S.C. § 183(*e*) (now 46 U.S.C. App. § 185). So too, they argue, was their recovery against Uncle Sam constrained by Uncle Sam's Federal court limitation action and Uncle Sam's insurance coverage. Nevertheless, *Joia* v. *Jo-Ja Serv. Corp.*, *supra*, did not involve a settlement, and in any event, the decision predated *McDermott, Inc.* v. *AmClyde*, *supra*.

In view of the Supreme Court's clear directive, we will not make distinctions based on the circumstances that motivated the estates to settle with Uncle Sam. Many factors may influence a plaintiff to settle for less compensation than he or she originally sought. "Because settlement amounts are based on rough estimates of liability, anticipated savings in litigation costs, and a host of other factors, they will rarely match exactly the amounts a trier of fact would have set." *McDermott, Inc.* v. *AmClyde*, 511 U.S. at 219. As the Supreme Court observed, "the settlement figure is likely to be significantly less than the settling defendant's equitable share of the loss, because settlement reflects the uncertainty of trial and provides the plaintiff with a 'war chest' with which to finance the litigation against the remaining defendants." *Id.* At 213.

Moreover, where the Supreme Court, in *McDermott, Inc.* v. *AmClyde*, *supra* at 220-221, explicitly referenced and distinguished the personal injury action involved in *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U.S. 256 (1979), on the basis of the lack of a settlement in that case, we will not presume that the Supreme Court intended its proportionate share rule to apply only to property damage cases, as the Curcuru and Giovinco estates urge.

7. *Conclusion.* Based on the foregoing, the judgments against Rose's Oil, in favor of the estates and Uncle Sam, are affirmed.

*So ordered.*