IRENA ANDERSON & another[1] *vs.* MICHAEL PAULO.

No. 08-P-1053.

Middlesex. February 5, 2009. - July 9, 2009.

Present: KAFKER, DREBEN, & WOLOHOJIAN, JJ.

*Negligence,* Fire. *Evidence,* Expert opinion.

At the trial of a civil complaint alleging that the defendant, a plumber, caused
   a fire in the plaintiff's apartment house by negligently using a machine for
   thawing frozen pipes, the judge erred in excluding from evidence the
   testimony of the plaintiff's expert as to the cause of the fire, where the
   expert, in his report, his affidavit, and his deposition, always stated his
   opinion in terms of probabilities rather than possibilities; where the expert's
   opinion, which was formed from his examination of the scene of the fire
   and from interviews with people at the scene, was adequately based in
   fact; and where his denying, on cross-examination, that he had a reason-
   able degree of scientific certainty about his opinion was not dispositive, in
   that his answer was an expression of caution in view of his having referred
   to his report as a preliminary one rather than an acknowledgment that his
   opinion was speculative. [639-641]
At the trial of a civil complaint alleging that the defendant, a plumber, caused
   a fire in the plaintiff's apartment house by negligently using a machine for
   thawing frozen pipes on pipes under a kitchen sink in one of the apart-
   ments, the judge erred in granting summary judgment in favor of the
   defendant, where the evidence was sufficient for a fact finder to conclude
   that the defendant was negligent in not waiting until the pipes had cooled
   before returning cleaning rags and chemicals to their place under the sink.
   [641-642]

CIVIL ACTION commenced in the Superior Court Department on
January 3, 2007.

The case was heard by *Thayer Fremont-Smith,* J., on a mo-
tion for summary judgment.

*Lynn M. Squillace* for the plaintiffs.

*Ethan Warren* for the defendant.

[1]Vermont Mutual Insurance Company, as subrogee of Irena Anderson. We
use the term "plaintiff" to refer to Irena Anderson.

DREBEN, J. Plaintiff Irena Anderson claims that defendant Michael Paulo, a plumber, caused a fire in the third-floor apartment of her house in Somerville by negligently using a machine for thawing frozen pipes. She appeals from the allowance by a judge of the Superior Court of Paulo's motion to strike the opinion of her expert, and from the subsequent allowance of Paulo's motion for summary judgment. We reverse.

We view the facts in the light most favorable to the plaintiff, the nonmoving party. *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). Materials presented on summary judgment showed the following. On January 9, 2004, after receiving a call from her third-floor tenant that the pipes in her kitchen were frozen, the plaintiff engaged Paulo, a licensed plumber, to remedy the situation. Paulo and an assistant spoke with the plaintiff, inspected the building, and proceeded to use an electric device known as an IceBreaker 350 to thaw the pipes.

Before using the device, Paulo cleared materials from underneath the third-floor kitchen sink where one end of each of the pipes was exposed. The kitchen sink cabinet "was full of chemicals, detergents, et cetera, all cleaning supplies." After running an electrical charge through the pipes and after the pipes had thawed, he disconnected the device and replaced the items that had been under the sink. He told the plaintiff that due to the severe frozen state of the pipes, he used the pipe-thawing machine for a longer period than usual. While Paulo was talking with the plaintiff outside the house, the second-floor tenant alerted them to a fire in the building.

The Somerville fire department responded to the fire call, and pursuant to a mutual aid agreement between the departments, a fire investigator certified by the Commonwealth, Lieutenant Brian Higgins of the Cambridge fire department, came to make what is known as an origin and cause determination.

Higgins's report detailing his investigation on the day of the fire was dated the day after the fire.[2] He stated that he interviewed the plaintiff, the tenants of the second- and third-floor apartments, and Paulo. The third-floor tenant accompanied him to the apartment and showed him, from the exterior of the building,

---

[2]There was a typographical error in the date, but it is clear he meant January 10, 2004.

the previous location of her sink. She also told Higgins that she had stored under her sink "Comet cleaner, Windex spray, plastic containers, soap, and some rags used for cleaning." Higgins's report contained Paulo's description of what he had done: that he had cleared out the contents under the sink, hooked up the machine, turned it on, and waited about ten minutes. He knew when the hot water started to flow because he saw ice coming through the faucet. He followed the same procedure for the cold water pipe. Once the pipes began to work, he cleaned up and put everything back under the third-floor sink. He put "chemicals, sponges, and spray bottles back." While he was talking outside with the plaintiff, the second-floor tenant came outside and said there was smoke in her second-floor kitchen ceiling. Paulo ran upstairs and saw fire coming from a place where a ceiling panel was missing. He tried to throw water on it for about a minute and then went outside and called 911.

Higgins's report describes his fire scene examination. After conducting a perimeter examination, he entered the building and went to the third floor. In his examination he used the "backwards theory," namely he worked from the least amount of damage to the most. The heaviest amount of damage was on the exterior bearing wall on the "Bravo" side of the building closest to the "Charlie."[3] This was where, on the inside, the sink had been, although the sink was no longer there and could not be found. The joists on the third floor just over the second-floor kitchen appeared to have burned from the third floor down because the heaviest amount of char was on the top side of the joist on the third floor. The stability of the building was in question because of a partial roof collapse closest to where the "Bravo" and "Charlie" corners met and because of the water that had been used to suppress the fire. As the fire had rekindled, Higgins had to leave the building.

His summary stated that his report is to be considered a preliminary origin and cause determination. He arrived at his opinion by conducting witness interviews and his fire scene examination. The cause of the fire was accidental in nature, and

"the ice defrosting machine utilized by the plumber just

---

[3]The record on appeal does not explain the use of the terms "Bravo" and "Charlie," but it appears they indicated certain sides of the building.

prior to the fire would have heated up the pipe sufficiently to be a competent heat source to ignite building materials as well as contents that were placed back under the 3rd floor sink once the pipes had been cleared. The contents from under the 3rd floor sink, building materials or a combination[] of both were most likely ignited as a result of direct contact with a hot pipe under the sink, radiant heat from a hot pipe under the sink, or a combination of both. I have determined that the area of origin was the 3rd floor 'Bravo' side of the building closest to the 'Charlie' side. It is the opinion of this fire investigator that heat source was a hot pipe under the 3rd floor sink through conduction or radiation or a combination of both igniting common combustibles or building materials or a combination of both."

In a 2007 affidavit and in a March 24, 2008, deposition, Higgins reiterated his opinion as to the cause of the fire. He also stated that he had no reason to believe that this was an electrical fire.[4]

While not questioning Higgins's credentials or expertise, Paulo argues, citing *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. 97, 103 (1988), that his opinion was too speculative, a claim concurred in by the motion judge. Paulo bases this claim on his counsel's questioning of Higgins during the latter's deposition, and on the opinion of Paulo's expert that Higgins's investigation was insufficient to determine the cause and origin of the fire.

At the deposition, Paulo's counsel pointed to the language of Higgins's report which stated that the report shall be considered "a preliminary origin and cause determination in an effort to assist the Somerville Fire Department." When asked whether a final determination was ever completed, Higgins replied, "I gathered as many people as I could at the scene before they were gone, did what I could to do a thorough examination of the building . . . with the safety issues in mind and the imminent collapse and things like that — the building was eventually knocked down.[5] What I did was I gathered all this information, put it together, gave my opinion, and I forwarded all the information over to the

---

[4]When examined by counsel for Paulo, Higgins stated in his deposition that he could not rule out an electrical fire "because there was nothing left in the area."

[5]The building was knocked down three days after the fire.

Somerville Fire Department." Counsel subsequently asked:

> *Q.:* "Do you have an opinion to a reasonable degree of scientific certainty as to the cause of this fire?"
>
> *A.:* "Well, at this time I have a preliminary, because that's what I said, a preliminary, that it's accidental relative to this machine. But because I wasn't able to get in there and do a complete investigation because of the structural integrity of the building, this is all that I can arrive at."
>
> *Q.:* "All right. So I take it that your opinion contained in your report is a preliminary one, correct?"
>
> *A.:* "That's correct."
>
> *Q.:* "Can you say that you have a reasonable degree of scientific certainty about that opinion?"
>
> *A.:* "Not at this time, no."

When questioned about research into the Icebreaker 350, Higgins said he went to a plumbing supply place to see what the device looked like. In order to determine how hot a copper pipe could get would require research that he did not do.[6] Asked how hot the pipe would have to get to ignite a rag, Higgins replied that it depended on the ignition temperature of the rag and whether the rag was soaked with some substance.

The expert opinion here is different from the one excluded in *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. at 103, a case relied on by Paulo. There, the expert's opinion on causation was flawed in two respects. First, the expert was unable to state his opinion in terms of probabilities and not possibilities. In contrast, Higgins in his report, his affidavit, and his deposition always used the words "most likely," a term of probability. The second flaw in *Goffredo* was the length of time — four and one-half years after the automobile accident — before the expert's opinion was sought. As a result, his opinion was based on assumptions as to force and distance that he could not measure and was, there-

---

[6]The owner's manual for the IceBreaker 350 states: "Since copper pipe will not heat up as fast as iron pipe, allow about 30 percent longer thawing time."

fore, held to be speculative.[7] Here, Higgins examined the scene while the fire was still burning, checked the area where the thawing device had been used, determined that the area that was the most charred was the origin of the fire, and ascertained that rags and combustible materials had been stored near hot pipes. From that evidence and from interviews with the people at the scene, Higgins reached his conclusion as to the most likely cause of the fire. We consider Higgins's opinion admissible and its exclusion by the motion judge unwarranted.

> "The relevant distinction is between an opinion based upon speculation and one adequately grounded in facts. Although a trial judge has some discretion in making that distinction, it may be an abuse of discretion to disallow expert testimony which is based upon reasonably adequate familiarity with the facts."

*Fourth St. Pub, Inc.* v. *National Union Fire Ins. Co.*, 28 Mass. App. Ct. 157, 161 (1989). As in that case, we consider the exclusion improper as Higgins's opinion was adequately based in fact. "[T]hat certain facts were unknown to the expert . . . does not render the testimony inadmissible, but rather goes to the weight of the evidence." *Curcuru* v. *Rose's Oil Serv., Inc.*, 66 Mass. App. Ct. 200, 208 n.9, cert. denied sub nom. *Rose's Oil Serv., Inc.* v. *Uncle Sam of '76, Inc.*, 549 U.S. 1020 (2006), quoting from Liacos, Brodin, & Avery, Massachusetts Evidence § 7.6.4, at 390 (7th ed. 1999).[8] In *Curcuru*, we held that an expert's testimony that a propeller shaft on a boat was bent was based on sufficient facts although the boat had sunk and the propeller was unavailable for examination. *Curcuru* v. *Rose's Oil Serv., Inc.*,

---

[7]The expert in *Goffredo* had testified that if the latch on the truck door were loose, it could move within the door so that the door could have swung open when the plaintiff came up against the door or when the truck swerved. The court pointed out that the expert had said that not all force exerted against the door would cause the door to open, and that only "sufficient" force would cause it to open. *Goffredo* v. *Mercedes-Benz Truck Co.*, 402 Mass. at 103. No one on behalf of the plaintiff had performed any tests to determine how much force was required, and the expert did not know whether the force exerted against the door during the accident could have caused the door to open. Moreover, the expert admitted that he had guessed the distance the latch would have had to move for the door to open by accident. *Id.* at 102-103.

[8]The same language is contained in Brodin & Avery, Massachusetts Evidence § 7.4.4, at 413 (8th ed. 2007).

66 Mass. App. Ct. at 208 n.9. See Mass. G. Evid. § 702 (2008-2009). See also *Sacco* v. *Roupenian*, 409 Mass. 25, 29-30 (1990) (sufficient facts for medical expert to work back from size of tumor he observed to determine size of tumor at earlier time).

Nor is the fact that Higgins on examination by Paulo's counsel answered "No" to the question, "Can you say that you have a reasonable degree of scientific certainty about that opinion?" dispositive. Although the term is "a useful shorthand expression that is helpful in forestalling challenges to the admissibility of expert testimony[,] [c]are must be taken . . . to see that the incantation does not become a semantic trap and the failure to voice it is not used as a basis for exclusion without analysis of the testimony itself." *Schulz* v. *Celotex Corp.*, 942 F.2d 204, 208 (3d Cir. 1991). This is particularly so when, as here, the words are used on cross-examination. Cf. *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 563 (2002). Higgins's answer in his deposition was an expression of caution in view of his having referred to his report as a preliminary one rather than an acknowledgment that his opinion was speculative. Cf. *United States* v. *Mornan*, 413 F.3d 372, 381 (3d Cir. 2005) ("nothing magical about the phrase, 'to a reasonable degree of scientific certainty' ").

The purpose of such "wooden phrases" is to ensure that the expert testimony is not based on speculation. See *Pupkar* v. *Tastaca*, 999 F. Supp. 644, 645 n.1 (D. Md. 1998). Our analysis of the evidence indicates that the expert's opinion, which was stated in terms of probabilities, was grounded on sufficient facts, was not speculative, and should have been admitted. That another expert thought it insufficient is, of course, not significant for purposes of admissibility.

The defendant also urges that even if the expert's opinion is admissible, the judgment should be affirmed, as there was insufficient evidence of negligence. We disagree. As indicated earlier, the evidence must be viewed in the light most favorable to the nonmoving party. Higgins's opinion indicated that the pipe-thawing machine used by Paulo just prior to the fire would have heated up the pipe sufficiently to ignite the building materials as well as the contents that were placed back under the sink. There was also corroborating evidence. The fire broke out a short time after the use of the machine, as Paulo was still on the premises when the second-floor neighbor noticed the fire on her ceiling. According to the plaintiff, Paulo told her "that due to the

severely frozen state of the water pipes he used the pipe-thawing machine for a longer amount of time than is usually necessary." The manual for the device contained warnings that during use of the machine, pipes may get very hot.[9]

We consider the foregoing evidence was sufficient for a fact finder to find that Paulo was negligent by not waiting until the pipes cooled before returning the cleaning rags and chemicals to their place under the sink. See *Geraci* v. *A.G. Tomasello & Son, Inc.*, 293 Mass. 552, 554-555 (1936) (finding of negligence upheld when defendant allowed accumulation of oil and gasoline under barrel of gasoline on his premises); *Chalfen* v. *Kraft*, 324 Mass. 1, 5 (1949) (jury question whether defendant should have contemplated that maintenance of rubbish and papers under stairs near boiler would lead to fire by cigarette or otherwise); *Campbell* v. *Romanos*, 346 Mass. 361, 366-367 (1963) (accumulation of rubbish including paint cans, papers, rags, and other items near elevator shaft together with fire chief's opinion that fire started in rubbish created jury question as to causation).

The judgment for the defendant is reversed, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[9]The manual included the following warnings:

"Warning

"A small empty pipe in the circuit may get very hot before a larger pipe will thaw. This could melt the solder in a copper line or set fire to nearby combustible materials."

"Warning

"The cables get hot during operation so keep them off rugs and finished floors that may be damaged by the heat."

"Warning

"If the wiring is grounded in two places, such as, at a barn and a house, a parallel low voltage current may be established [illegible] hot and could start a fire in either building. Disconnect all grounds at either end of the electrical wiring system."

"Note

"Good connections are necessary. Before connecting the cables, clean all pipes by sanding with coarse emery cloth. Make sure all connections are tight to prevent overheating or arcing at the clamps."